UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CA, Inc., d/b/a CA TECHNOLOGIES,

     Plaintiff(s),

  -against-

NEW RELIC, INC.,
     Defendant(s).
------------------------------------------------------------X

**MEMORANDUM &
ORDER**

CV 12-5468 (WDW)

**WALL, Magistrate Judge:**

  Before the court, on consent of the parties, is their application for construction of four terms in the patents-in-suit: U.S. Patent No. 7,225,361 B2 (the '361 Patent), entitled "Detecting a Stalled Routine;" U. S. Patent No. 7,797,580 B2 (the '580 Patent), entitled "Determining that a Routine has Stalled;" and U.S. Patent No. 7,512,935 B1 (the '935 Patent), entitled "Adding Functionality to Existing Code at Exits." The parties submitted briefs and affidavits, and a claim construction hearing was held on November 25, 2013. Based on the submitted documents and the hearing, and for the reasons set forth herein, the motion is decided as follows:

  1.) "Executed upon any exit" has its plain and ordinary meaning.
  2.) "Reporting" has its plain and ordinary meaning.
  3.) "Stalled routine" means "a routine that does not complete within a pre-determined time frame," a construction that is consistent with the plain and ordinary meaning of the claim term.
  4.) "Approximation of an expected time frame" has its plain and ordinary meaning, a meaning that implicitly includes the concept of a pre-determined time frame.

**BACKGROUND**

  In this patent case, plaintiff CA contends that defendant New Relic has infringed on three patents regarding an application performance management ("APM") product, which monitors the performance of applications built for smart phones and tablet computers. The CEO of New

Relic, Lewis Cirne, was the founder of Wily Technologies, which he sold to CA along with the three patents in 2006 for $375 million.  Cirne is listed as the named inventor, along with Jeffrey Cobb, of two of the patents.  After the acquisition, Cirne served as the CTO of CA's Wily Division for one year, and resigned in 2007 after a leave of absence.  He founded New Relic in 2008 and created a new APM product, which CA claims infringes, contributes to and/or induces infringement of several claims in three of its patents.  Since filing the Complaint, CA has narrowed the allegations of infringement.  A "Joint Stipulation Regarding Non-Assertion Against PHP, Ruby and Python Agent Instrumentalities" was filed on 11/22/13, and a status report was filed on 1/2/14.  DE[75] & [83].

The Patents-in-Suit:

CA describes the Patents-in-Suit as the "secret sauce" that allows APM tools to "more rapidly and precisely analyze and diagnose problems in applications without requiring software engineers or developers to manually rewrite an application's source code." DE[40] at 3.  They are of value, CA maintains, because methods of modifiying existing applications by altering an application's object code rather than altering the source code are cheaper, less time-consuming, and more accurate in addressing problems.  Even with this functionality, however, CA advises, "substantial difficulties remain in precisely and accurately tracking an application's performance and diagnosing and fixing errors arising therein . . . [and the] Patents-in Suit are directed to resolving these difficulties." *Id.*

As noted, the patents at issue are U.S. Patent No. 7,225,361 B2 (the '361 Patent), entitled "Detecting a Stalled Routine;" U. S. Patent No. 7,797,580 B2 (the '580 Patent), entitled "Determining that a Routine has Stalled;" and U.S. Patent No. 7,512,935 B1 (the '935 Patent),

2

entitled "Adding Functionality to Existing Code at Exits." New Relic states that the '580 patent is a continuation of the '361 patent, "such that both 'stall' patents share a common written description," and the two "stall" patents "incorporate by reference the application that led to the '935 patent." DE[39] at 2. Thus, New Relic asserts, the patents are "connected and therefore share a common vocabulary." *Id.*

CA does not disagree, asserting that "the '361 and '580 patents are related, and provide solutions to insert additional functionality into an application's object code to determine whether programming routines have stalled." DE[40] at 4. For example, a timer might be included so that routines that fail to complete in a certain time frame can be identified as having stalled. Both patents, CA says, "enable developers to precisely determine whether routines have stalled without accessing the source code, and without adding extra code that is unnecessary to the intended functions of the application, among other things." *Id.* The '935 Patent "allows functionality to be inserted into an application's object code that ensures that new exit code will be executed regardless how a routine exits." For example, CA states, to stop the time in the given example, object code could be altered to account for any possible exit. *Id.*

The parties disagree on the construction of several claim terms at issue. Since this motion was first made, they have, however, narrowed the claim terms to be construed by the court. The claim terms "object code," "byte code," "exception table," "exceptions data store," and "exit code" no longer require construction. *See* DE[75] & [83]. And, the parties have provided the court with a list of agreed constructions for various claim terms. *See* DE[72] & [83], Ex. A. The four terms now before the court for construction, as set out in Exhibit B to DE[72] and [83], are: (1) in Patent '361, "stalled routine;" (2) in Patent '935, "executed upon any exit; and, (3 & 4)

3

in Patent '580, "approximation of an expected time frame" and "reporting."

## DISCUSSION

Claim construction is a matter of law, exclusively within the province of the court. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 384-91 (1996). In *Phillips v. AWH Corp.*, the Federal Circuit elaborated the principles that govern claim construction. 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). "[T]he words of a claim are generally given their ordinary and customary meaning," which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1312–13 (internal quotation marks omitted). The Federal Circuit has focused the district courts' attention on "the importance of intrinsic evidence," which consists of the claims, specification, and prosecution history. *Id*. at 1317. "[A] claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to ... distinctly claim ... as his invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (internal quotation marks and alterations omitted). Accordingly, "one of the cardinal sins of patent law [is] reading a limitation from the written description [contained in the specification] into the claims." *Phillips*, 415 F.3d at 1320. But, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. at 1313.

In determining how a person of "ordinary skill in the art" would understand and define the terms in a claim, the court has a number of sources available to it. As noted, of primary importance is not only the "context of the particular claim in which the disputed term appears,

4

but ... the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Indeed, the context of the claim itself is "highly instructive" in a determination of the meaning of a term, and furthermore, "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id*. at 1314 (citing *Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1374 (Fed. Cir. 2004) and *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)).

Patent claims must also "be read in view of the specification, of which they are a part." *Markman*., 52 F. 3d at 979. Indeed, the specification, in which the inventor describes the invention, "'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips,* 415 F.3d at 1315 (citing *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The importance of the specification in construing claims is due in part to the requirement imposed on inventors that the specification "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art ... to make and use the same." 35 U.S.C. § 112, ¶ 1. Accordingly, it follows that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Società per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir.1998). Indeed, it is often in the specification that the inventor has demonstrated an intent to be his own "lexicographer," by using terms "in a manner inconsistent with their ordinary meaning." *Vitronics Corp.*, 90 F.3d at 1582. However, the court must be cautious not to unduly restrict the scope of the claims at issue by "adding limitations appearing only in the specification," particularly in the embodiments

included in the patent application. *Electro Med. Sys., S.A. v. Cooper Life Sciences., Inc.,* 34 F.3d 1048, 1054 (Fed. Cir.1994). "Particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." *Id*. Stated otherwise, "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water,* 381 F.3d at 1117.

Finally, courts may look to extrinsic evidence to define claim terms. Extrinsic evidence consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (internal quotation marks omitted). However, extrinsic evidence may not be used "to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id*. at 1324.

The Federal Circuit has made it clear that if a claim term is used in its "ordinary and accustomed meaning," it is improper to limit that meaning by importing definitions from the specification or other sources. *See, e.g., Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990–92 (Fed. Cir.1999). Furthermore, disputed patent terms are to be construed at all times from the vantage point of one skilled in the relevant art (*see Phillips*, 415 F.3d at 1313), and thus a focus on clarifying terms for a lay jury is misdirected. *See Elbex Video, Ltd. v. Axis Communications, Inc.,* 2008 WL 5779782, *7 (E.D.N.Y. Aug. 19, 2008).

With these claim construction principles in mind, I turn to construction of the disputed claim terms.

**Patent '935: "Executed Upon Any Exit"**

The term "executed upon any exit" appears in claims 13, 29 and 41, which depend from independent claims 1, 22 and 35 respectively. DE[39] at 22. CA argues that the term should be

given its plain and ordinary meaning[1]. New Relic, on the other hand, argues that it means "executed upon all exits." New Relic takes the position that it urges this construction as clarification for the jury and expresses concern that CA will later try to define the word "any" as meaning "one or more," as opposed to "all." DE[39] at 22-23  CA says that it has not taken that position and maintains that there is thus no dispute. DE[48] at 21. New Relic argues that CA has not definitively said that it will not, in the future, make the disputed contention, and that there is a dispute, which should be settled by a finding that "executed upon any exit" means "executed upon all exits." DE[49] at 19.  New Relic further argues that CA has not proposed an alternative construction and has "provided no argument as to why New Relic's proposal would not reflect the meaning of the term to one of ordinary skill in the art at the time of the patent application."

CA has urged that the term has its plain and ordinary meaning. Claim terms are entitled to a "'heavy presumption'" that they carry their "ordinary and customary meaning." *Elbex Video,* 2008 WL 5779782, at *40 (citing *Teleflex, Inc. v. Ficosa N. Am. Group*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)). As noted *supra*, the "ordinary meaning must be determined from the standpoint of a person of ordinary skill in the relevant art." *Id*. Nothing in New Relic's proposed construction changes the plain and ordinary meaning of the term. And, as noted *supra*, disputed patent terms are to be construed at all times from the vantage point of one skilled in the relevant art," *(see Phillips*, 415 F.3d at 1313), and "a focus on clarifying terms for a lay jury is

---

[1]The term "plain and ordinary" is used by the parties herein.  The relevant caselaw often uses the term "ordinary and customary meaning," from *Phillips* (415 F.3d at 1313*).* Some cases refer to "plain and ordinary" (*see,, e.g., O2 Micro Int'l Ltd. v. Beyond innovation Technology Co.,* 521 F.3d 1351, 1361 (Fed. Cir. 2008)), or simply to "plain meaning" (*see, e.g. Leveraged Innovations, LLC v. NASDAQ OMX Group, Inc.,* 2012 WL 4062100, *7 (S.D.N.Y. Sept. 14, 2012)).  I use the term "plain and ordinary" herein to reflect the parties' usage.

misdirected." *See Elbex Video,* 2008 WL 5779782 at *7. Thus, I find that the term "executed upon any exit," has its plain and ordinary meaning.

**Patent '580: "Reporting"**

"Reporting" was added to the list of disputed terms after the original briefs had been filed, so the parties filed supplemental briefs regarding this term. *See* DE [64], [65], [68] and [69]. New Relic argues that the '580 patent discloses numerous ways of reporting that a particular routine has stalled, and that the "common denominator for all of these methods is that they are directed to a 'suitable means for communicating to a user in a meaningful manner.'" DE[64] at 1. CA argues that the word reporting, as used in the '580 patent, is not limited to "communicating to a user," but has that word's plain and ordinary meaning and that no construction of its meaning by the court is necessary because nothing in the intrinsic evidence "unequivocally mandates a different meaning." DE[65] at 1.

The term "reporting " is used in claims 1, 7, 11, 15 and 20 of the patent. There is no dispute that the patent, generally speaking, includes in the claims reporting of the fact of a stalled routine. The relevant claims are as follows:

> **1**. A method for detecting whether a routine has stalled, comprising:
>     receiving a call from within a particular routine indicating that said particular
>       routine has started, said particular routine is one of a plurality of routines that
>       comprise a process;
>     receiving a call from within a particular routine indicating that said particular
>       routine has completed, if said particular routine has completed;
>     automatically determining that said particular routine has stalled if said call
>       indicating that said particular routine has completed is not provided prior to
>       being overdue, such that being overdue is based on said call indicating that a
>       particular routine has started, and
>     reporting that said particular routine has stalled, if said particular routine has
>       stalled.

\*\*\*\*\*\*

**7**. One or more processor readable storage devices having processor readable code embodied on said processor readable storage devices, said processor readable code for programming one or more processors to perform a method comprising:
    receiving a call from within a first routine indicting that said first routine has started;
    starting a timing mechanism in response to said call indicating that said first routine has started;
    receiving a call from within said first routine indicating that said first routine has completed, if said first routine has completed;
    stopping said timing mechanism in response to receiving said call indicating that said first routine has completed; and
    reporting said first routine as stalled if said timing mechanism is not stopped prior to a determination that said timing mechanism is overdue.

\*\*\*\*\*

**11**. One or more processor readable storage devices having processor readable code embodied on said processor readable storage devices, said processor readable code for programming one or more processors to perform a method comprising:
    receiving a call from within a particular routine indicating that said particular routine has started;
    receiving a call from within said particular routine indicating that said particular routine has completed, if said particular routine has completed; and
    reporting said particular routine as stalled if said call indicting that said particular routine has completed is not received prior to being overdue in relation to said call indicating that said particular routine has started.

\*\*\*\*\*

**15**. A method for detecting whether a routine has stalled, comprising:
    receiving a first call from within a particular routine indicating that said particular routine has started;
    receiving a second call from within said particular routine indicating that said particular routine has completed;
    automatically determining whether said particular routine is stalled based on said first call and said second call, and
    reporting said particular routine as being stalled if said particular routine is determined to be stalled.

\*\*\*\*\*

> **20**.  One or more processor readable storage devices having processor readable code embodied on said processor readable storage devices, said processor readable code for programming one or more processors to perform a method comprising:
>> receiving a first call from within a particular routine indicating that said particular routine has started, said particular routine is one of a plurality of routines that comprise a process;
>> receiving a second call from within a particular routine indicating that said particular routine has completed;
>> automatically determining whether said particular routine is stalled based on said first call and said second call, and
>> reporting said particular routine as being stalled if said particular routine is determined to be stalled.

DE[39-4], Ex. C, United States Patent 7,797,580 B2.

Nothing in the claim language, the threshold level of intrinsic evidence, explicitly states an entity to which the reporting will be done, merely that it will be reported.  New Relic argues that in every disclosed embodiment, the reporting mechanism is directed to reporting to a user. DE[68] at 3. In support of its contention that the reporting means communication to a user, New Relic looks to specification language.  The most relevant section reads as follows:

> Step **410** can include sending an email, sending a page, displaying a dialog box, playing a sound, printing a document, writing to a file, writing to report/log, reporting to a routine, displaying the data graphically or any other suitable means for communicating the information to a user in a meaningful manner.

'580 patent 10:51-56.

That language and other language in the specification, New Relic urges, establishes that the patent claims different ways of communicating information to a user regarding whether a routine has stalled.  CA stresses the primacy of claim language in the claim construction process, arguing that nothing in the claim language requires reporting to a user.  But the "claims . . . do not stand alone.  Rather, they are part of 'a fully integrated written instrument,' consisting

10

principally of a specification that concludes with the claims.  As noted earlier, for that reason, claims 'must be read in view of the specification, of which they are a part. . . . [T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips,* 415 F.3d at 1314-15.  Thus, the court will look to the specification language.

   CA argues that the reporting methods of  "writing to a file, writing to report/log, reporting to a routine" do not communicate to a user, and thus the quoted sentence does not limit reporting to communication with a user.  CA argues further that nothing in the claims requires that reporting be to a user, and that "it is not uncommon for results from one portion of a program to be 'reported' to another portion of the program for use in achieving a final objective of the program."  DE[65] at 4-5.  In that circumstance, CA continues, "such intermediate results would never be delivered to a user [and t]he language of the claims contemplates just such a scenario." *Id.* at 5.

   CA also argues that the phrase "or any other suitable means for communicating the information to a user in a meaningful manner" modifies only the phrase "displaying the data graphically," and not the other reporting methods listed.  DE[69] at 3.  While the lack of a comma between "displaying the data graphically" and  "or any other suitable means for communicating the information to a user in a meaningful manner" lends some support to that argument, that interpretation renders the entire sentence contradictory, in that it suggests that only "displaying the data graphically" is a way to communicate meaningfully with a user, and the other methods, including "sending an email, sending a page, displaying a dialog box, playing a sound, [or] printing a document" are not meaningful communications with a user.  The court will

11

not construe such a meaning into the language.  I find that the sentence is poorly drafted, and that the list contains both methods of communicating with a user and other methods of reporting.

Other parts of the specification also refer to users, to wit:  "Many different types of reporting mechanisms can be used with the current invention.  No one reporting mechanism is more suited for the current invention because the reporting mechanism used is likely dictated by the needs of the user."  '580 Patent, 10:1-5.  But CA urges that the "needs of the user may not include seeing the results of the data itself if it is the program itself that will be tasked with the use of those results or data."  DE[65] at 7-8.  A reading of the specification language at 9:58 - 10:56 sets forth a number of ways to report that a method or routine has stalled.  And, some of those methods, including the "counter" discussed therein, do not report immediately to a user.  But, if a threshold is reached, the counter reports to "a user, client, etc."  10:31-32.  This raises the question of how a user differs from a client, and neither party has addressed who, exactly, a user is.  Apparently, however, users are different from clients.

New Relic is correct that many aspects of the specification support a construction of "reporting" meaning "reporting to a user."  But not all aspects do so, and there insufficient basis to adopt the narrow construction urged by New Relic.  The primary sentence supporting that construction, that is, the one at 10:51-56, lists three different reporting mechanisms that are not user-directed, that is, "writing to a file, writing to report/log, reporting to a routine."  As discussed *supra*, the structure of that sentence can be read to include those mechanisms in the category of "suitable means for communicating the information to a user in a meaningful manner," but I find that to be a result of poor drafting.   Overall, the specification does not require the court to construe the term in the narrow way urged by New Relic.  "Although the

specification often describes very specific embodiments of the invention," the Federal Circuit has "repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1316. Here, I find that construing "reporting" to mean "reporting to a user" would be improperly importing a limitation from the specification into the claims. "Reporting" has its plain and ordinary meaning.

**Patent '361: "Stalled Routine"**

New Relic explains that the precise term "stalled routine" does not appear in the '361 claims. DE[39] at 23, n.9. Instead, the patent uses such terms as "determine if first said routine has stalled," or "reporting said first routine as stalled." New Relic states that it intends its claim construction proposal to "cover the different instances in the claims of a routine that has or is stalled via the term 'stalled routine.'" *Id.* Using that term, New Relic argues that "stalled routine" in the '361 patent means "a routine that continues to run past a pre-determined threshold time." CA construes it as "a routine that does not complete within a desired time frame." The term "stalled" appears in claims 1, 2, 4-6, 28, 30, and 32 of the '361 patent, but the parties are not arguing over the meaning of the word "stalled," but the concept of a routine that has stalled.

The '361 specification defines a stalled routine as,"[ ]typically, . . . a bounded operation that has continued to be active significantly past a reasonable time of completion, where the definition of reasonable is operation dependent." '361 Patent, 1:33-36. The specification sets forth a number of embodiments of the invention, all of which, New Relic argues, present discussions of stalls "being bounded by some pre-determined threshold time." DE[39] at 23. CA's proposed construction, New Relic asserts, is a"more unbounded interpretation of a "desired time frame," that does not account for "who does the desiring" or when the desire arises. *Id*. But

the same criticism can be made of New Relic's proposal, which does not explain who does the pre-determining or when it is determined.

The dispute goes to both the word "pre-determined" and the phrase "threshold time." As to the pre-determined element, it appears to be a distinction without a difference. The parties implicitly agree that the invention includes some time frame that is in the code and that allows a stall to be identified in terms of how long the routine is taking to run. In this regard, it is difficult to see how their proposed constructions differ, with both of them reflecting the ordinary meaning that a person skilled in the art would find. Whatever words one uses, it is clear that the time frame, or the amount of time being used to determine a stall, has to be "pre-determined," to the extent that the time has to be set before the program starts to run, whether you call that a pre-determined time or a desired time frame. That amount of time might vary from program to program, or, to use New Relic's term, be routine-specific, but there is always a pre-set time.

CA appears to interpret New Relic's proposal as requiring an exact time, and argues that no exact time is necessary. *See* DE[40] at 15. Instead, it argues, the specification teaches that in at least one embodiment, "the system may not necessarily determine the exact time that a method stalls because it only checks at certain intervals against an approximation of a time that the method should have been finished." *Id.*, quoting '361 Patent, 9:54-57. I agree, as does New Relic, that the claim language and the specifications illustrate that no exact time is necessary. New Relic's proposal does not require a pre-determined exact time, only a pre-determined time frame. DE[49] at 20. The term "pre-determined" does not appear in the Patent, but, as New Relic observes, every disclosed embodiment requires the use of a pre-determined time frame, whether that is called a threshold, "due time," "expected time, or "pre-set time period." DE[49]

14

at 19 (quoting from specification). I agree with New Relic that the "temporal requirement" implicit in the Patent includes a predetermined, but not exact, time frame and a person skilled in the art would find the same.

The parties also disagree over New Relic's use of the phrase "threshold time." That phrase appears in the specification, although not in the claims. CA argues that its use in the specification is "only one of various methods taught to detect a stalled routine or method, [and] it would be improper, as a matter of law, to limit the claims to one of several embodiments, particularly where there does not exist an unmistakable avowal of claim scope." DE[48] at 22-23. Neither party has precisely defined what a "threshold time" means, but I accept CA's objection that construing the term "stalled routine" to include some "threshold time" would be importing a limitation that is not justified.

Considering all of these factors, I construe the term "stalled routine" or the equivalents thereof to be a combination of the proposed constructions, meaning "a routine that does not complete within a pre-determined time frame." This construction is consistent with the ordinary meaning of the claim term and the intrinsic evidence.

**Patent '580, "approximation of an expected time frame"**

The term "approximation of an expected time frame" is used in Claims 4,6,12,18 and 23 of the '580 patent. An example of its use is as follows, in Claim 6:

> **6.** A method for detecting whether a method has stalled, comprising:
>
> receiving an indication that a particular method of an object is running, and
> automatically determining whether said particular method has stalled by detecting whether a thread entered said particular method and did not return within an approximation of an expected time frame.

This term is related to the stalled routine discussion, *supra*, inasmuch as New Relic seeks to construe "approximation of an expected time frame" as meaning a "predetermined threshold," while CA seeks to give it its plain and ordinary meaning, with no construction by the court. As discussed earlier, the element of pre-determination as to the time frame is implicit. CA argues that the "approximation of an expected time frame" is broader than a "predetermined threshold," and thus should not be adopted. I find that the proposed construction adds nothing to one's understanding of the term, which can be understood in its plain and ordinary meaning. That meaning, as explained earlier, implicitly includes the concept of a pre-determined time frame and that word does not have to be added.

## CONCLUSION

For the reasons set forth above, the motion is decided as follows:

1.) "Executed upon any exit" has its plain and ordinary meaning.
2.) "Reporting" has its plain and ordinary meaning.
3.) "Stalled routine" means "a routine that does not complete within a pre-determined time frame," a construction that is consistent with the ordinary meaning of the claim term.
4.) "Approximation of an expected time frame" has its plain and ordinary meaning, a meaning that implicitly includes the concept of a pre-determined time frame.

Dated: Central Islip, New York  
January 15, 2014

SO ORDERED:

/s/ William D. Wall  
WILLIAM D. WALL  
United States Magistrate Judge