UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CA, INC., D/B/A CA TECHNOLOGIES, ·

                  Plaintiff,

     - against -

NEW RELIC, INC.,

                Defendant.

-----------------------------------------------------------------X

**MEMORANDUM
AND ORDER**

CV 12-5468 (AKT)

F I L E D
IN CLERK'
U.S. DISTR

★   APR 08 2015   ★

LONG ISLAND ⌣ · · ·

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

## I.   PRELIMINARY STATEMENT

In this patent infringement action, plaintiff CA, Inc. ("CA") alleges that defendant New

Relic, Inc. ("New Relic") has infringed three patents which deal with monitoring the

performance of software applications, otherwise known as application performance management

("APM") software. *See generally* Compl. [DE 1]. New Relic asserted in its First Affirmative

Defense that CA's three patents are invalid for failure to satisfy the conditions of patentability.

*See* Answer to Compl. ¶ 62 [DE 8].

Presently before the Court is CA's motion for partial summary judgment seeking to strike

New Relic's First Affirmative Defense as to two of the three patents at issue – U.S. Patent No.

7,225,361 B2 ("the '361 Patent") and U.S. Patent No. 7,797,580 B2 ("the '580 Patent") – and to

estop New Relic from contesting the validity of those two patents. *See* DE 116. CA's motion is

premised on the equitable doctrine of assignor estoppel, which bars an inventor who assigned his

or her patent to another for valuable consideration from later asserting that the patent is invalid.

*See* Pl.'s Memorandum of Law in Support of its Motion For Partial Summary Judgment Based

on the Doctrine of Assignor Estoppel ("Pl.'s Mem.") at 1 [DE 116-1]. The doctrine also bars companies in privity with the inventor from asserting the defense of invalidity where the company relied on the inventor's knowledge and assistance in creating products accused of infringing the inventor's patents. *See id.*

Lewis Cirne ("Cirne"), the sole founder and CEO of Defendant New Relic, is one of two named inventors of the '361 and '580 Patents. The parties do not dispute that Cirne would be personally estopped from asserting that the '361 and '580 Patents that he co-invented are invalid. *See* Defendant New Relic's Corrected Memorandum of Law in Opposition to CA's Motion for Partial Summary Judgment ("Def.'s Opp.") at 16 n.11 [DE 119]; Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion ("Pl.'s Reply") at 2 [DE 128]. Rather, the sole issue before the Court is whether New Relic should be estopped from asserting an invalidity defense because it is in privity with Cirne under the doctrine of assignor estoppel.

Although the parties generally agree on the applicable law governing the doctrine of assignor estoppel, they dispute whether the record supports a finding, as a matter of law, of privity between New Relic and Cirne. CA argues the undisputed facts show that New Relic sufficiently availed itself of Cirne's knowledge and assistance in developing the accused products to justify finding privity between New Relic and Cirne. *See* Pl.'s Mem. at 15-16. New Relic, on the other hand, asserts that because New Relic did not rely on Cirne's knowledge or assistance in developing the specific infringing features of the accused products, there are genuine issues of material fact which preclude summary judgment on assignor estoppel grounds. *See* Def.'s Opp. at 16. Based upon a review of the parties' submissions and the relevant case law, the Court concludes that New Relic is in privity with Cirne and is therefore barred under the doctrine of assignor estoppel from asserting an invalidity defense against the '361 and '580

Patents. Accordingly, for reasons explained below, CA's motion for partial summary judgment is GRANTED.

## II.  BACKGROUND

The Court's account of the facts is derived from the parties' submissions in support of and in opposition to the instant motion for partial summary judgment, including: Plaintiff's Statement of Undisputed Material Facts In Support Of Motion For Partial Summary Judgment ("Pl.'s Rule 56.1 Stmt.") [DE 116-2]; Response to CA's Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment ("Def.'s Rule 56.1 Counterstmt.") [DE 119-1], as well as the affidavits, deposition testimony, and other exhibits attached to the motion papers. Where the parties' Rule 56.1 Statements contain specific citations to the record as support, those documents are incorporated by reference and the Court cites to the Rule 56.1 Statement, rather than the underlying citation to the record. Where the facts set forth in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* E.D.N.Y. Local Rule 56.1(c); *Petito v. Puritan's Pride, Inc.*, 35 F.Supp.3d 494, 497 (S.D.N.Y. 2014). The Court construes the fact in the light most favorable to New Relic as the nonmoving party. *Viacom Intern., Inc. v. YouTube, Inc.*, 676 F.3d 19, 30 (2d Cir. 2012); *Petito*, 35 F.Supp.3d at 502. The following facts are undisputed unless otherwise noted.

CA is a provider of enterprise technology management software and solutions. Plaintiff's Statement of Undisputed Material Facts In Support Of Motion For Partial Summary Judgment

("Pl.'s Rule 56.1 Stmt.") ¶ 1.[1] One of its software products, Introscope, is an APM tool which customers use to monitor and manage the performance of web applications written using Java or .NET software languages. *Id.* New Relic also provides an APM service that monitors web applications written in Java and .NET, as well as the Python, Ruby, and PHP software languages, among others. *Id.* ¶ 2. CA holds a number of patents related to its products, including two patents related to Introscope which are the subject of the instant motion. *Id.* ¶ 3. As noted, the patents at issue are the '361 Patent, entitled "Detecting a Stalled Routine," and the '580 Patent, entitled "Determining that a Routine has Stalled" (collectively, the "Stall Detection Patents").[2] The Stall Detection Patents were issued to Jeffrey Cobb and Lewis Cirne in 2007 and 2010, respectively. *Id.* ¶¶ 19, 25.

Cirne is the founder and Chief Executive Officer of Defendant New Relic. *Id.* ¶ 7.[3] Prior to founding New Relic, Cirne started a company in 1998 called Wily Technologies, Inc. *Id.* ¶ 9.

---

[1]      Although New Relic does not dispute this statement of fact, it contends that the evidence cited by CA does not support its factual assertion. Def.'s Rule 56.1 Counterstmt. ¶ 1. New Relic makes this claim in response to several of CA's other statements of fact as well. *See id.* ¶¶ 3, 8, 14, 20. Having reviewed the evidence cited in support of these statements of fact and on the motion as a whole, the Court is satisfied that the record supports CA's assertions. *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n. 5 (2d Cir. 2003)).

[2]      This litigation also concerns a third patent held by CA – U.S. Patent No. 7,512,935 B1 (the '935 patent) – which is not in dispute on the instant motion.

[3]      Here, and in multiple instances throughout its Rule 56.1 Counterstatement, New Relic responds to CA's statement of the facts by stating that the facts are "Undisputed" but that "New Relic objects to and asks the Court to disregard or strike" certain exhibits cited by CA to support its statement and/or certain facts contained within those exhibits. *See, e.g.*, Def.'s Rule 56.1 Counterstmt. ¶¶ 7, 9, 10, 11, 27, 30, 33, 43, 45, 62, 67, 68. Where this occurs, the Court will consider the statement provided by CA as undisputed because New Relic's initial response in each instance is, in fact, "Undisputed." *See Washington v. City of New York*, No. 05 CIV. 8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (taking the statement of relevant facts provided by the defendants "as true" where the plaintiffs initial response in each instance was "Admit, but deny to the extent the statement cites to inadmissible evidence" and finding that, in

4

Cirne founded Wily in connection with his invention of a new approach to APM and is considered a pioneer and driving innovative force in the APM field. *Id.* ¶¶ 10-11. Cirne served as Wily's CEO from 1998 to 2001, and as its Chief Technology Officer until approximately 2006. *Id.* ¶¶ 8-9. During his tenure at Wily, Cirne helped develop Introscope, which became Wily's flagship APM product, although the parties dispute the scope of Cirne's role in Introscope's development. *Id.* ¶ 12; *see* Def.'s Rule 56.1 Counterstmt. ¶ 12. Wily and its Introscope product were commercially successful. Pl.'s Rule 56.1 Stmt. ¶ 27.

CA asserts that in 2001, during the development of the Introscope product, Cirne and Jeff Cobb solved an important technical issue raised by customers by creating a solution that helped customers understand when things were slowing down and backing up in their applications. *Id.* ¶ 13. The Stall Detection Patents were implemented in Introscope to address this problem and solve it. *See id.* New Relic disputes that the technical issue purportedly solved by the Stall Detection Patents was "an important one," noting that the stall detection feature in Introscope was not one of the most important features to customers. Def.'s Rule 56.1 Counterstmt. ¶ 13.

---

any event, the challenged evidence "would undoubtedly be admissible at trial"). Furthermore, the Court observes that, to the extent New Relic objects to CA's use of printed statements from New Relic's own website as exhibits – which bear both a time-and-date stamp and URL, and which have been authenticated in a declaration by CA's counsel, *see* Decl. of Matthew K. Gates [DE 118] – those documents are admissible in evidence. *See In re Vitamin C Antitrust Litig.*, No. 06-MD-1738, 2013 WL 504257, at *5 (E.D.N.Y. Feb. 8, 2013) ("Statements on a website can be considered business records within the scope of Rule 803(6).") (citing *Doctors Med. Ctr. of Modesto v. Global Excel Mgmt., Inc.*, No 08–CV–1231, 2009 WL 2500546, at *9 (E.D. Cal. Aug.14, 2009) (concluding that statements on a party's website were admissible, despite hearsay objections, under the business records exception and as party admissions)); *see also Langbord v. U.S. Dep't of Treasury*, No. CIV.A. 06-5315, 2011 WL 2621310, at *4 (E.D. Pa. July 5, 2011) (holding that "a 2007 printout from the Mint's website listing the 1933 Double Eagle as a circulating coin, is admissible as a statement of a party opponent, no matter what the Mint intended by posting the information.").

According to New Relic, the Stall Detection Patents, "at most, patented one particular method of stall detection, and were therefore not an important solution." *Id.*[4]

On February 21, 2002, Wily filed an application with the United States Patent and Trademark Office ("USPTO") entitled "Detecting a Stalled Routine," which would eventually become the '361 Patent. Pl.'s Rule 56.1 Stmt. ¶ 14. Cirne and Cobb are the named inventors on the '361 patent application, *id.*, and Wily submitted a "Declaration for Patent Application" in support of the '361 Application, *id.* ¶ 16. Cirne executed the declaration on May 7, 2002 and declared his belief that he was the first and joint inventor of the invention entitled: DETECTING A STALLED ROUTINE . . . ." *Id.* ¶ 16. On June 27, 2005, Wily filed an application with the USPTO that would eventually become the '580 Patent. *Id.* ¶ 20. Cirne and Cobb are the named inventors on the '580 Application, which was filed as a continuation of the '361 Patent. *Id.* Cirne executed an assignment of his rights to the intellectual property that would eventually become the Stall Detection Patents to Wily. *Id.* ¶¶ 18, 23, n.7. The assignment of the subject matter of the '361 Patent to Wily was executed on May, 7, 2002. *Id.* ¶ 18. Likewise, Cirne assigned to Wily for "good and valuable consideration" his rights to the intellectual property which would eventually become the '580 Patent. *Id.* ¶ 23.[5] After the assignment, Cirne continued to work at Wily, where he received a salary, stock and other benefits. *Id.* ¶¶ 18, 24. The Stall Detection Patents were issued to Cirne and Cobb on May 29, 2007 and September 14, 2010, respectively. *Id.* ¶¶ 19, 25.

---

[4]     On this point, New Relic further asserts in its Rule 56.1 Counterstatement that "[t]here are many prior art methods for detecting a stall," Def.'s Rule 56.1 Counterstmt. ¶ 93, and that the Stall Detection Patents, "at most, patented specific methods of stall detection, *id.* ¶ 92.

[5]     This assignment took place in 2002. The '580 Patent, which is a continuation of the '361 Patent, was conveyed to Wily by Cirne as part of the assignment of the '361 application. Pl's Rule 56.1 Stmt. ¶ 23 n.7.

In 2006, CA purchased 100 % of the stock in Wily for approximately $375 million and merged Wily into CA. *Id.* ¶ 28. According to CA, as part of the acquisition, (i) CA acquired Introscope – which it continues to sell today – as well as Wily's intellectual property, including the '361 and '580 Patents, and (ii) Wily assigned all its rights in the patents to CA. *Id.* ¶¶ 29-30. New Relic points out that the Stall Detection Patents did not issue until 2007 and 2010 and thus were pending patent applications, not issued patents, at the time CA acquired Wily. Def.'s Rule 56.1 Counterstmt. ¶ 29. ███████████████████████████████████

██████. Pl.'s Rule 56.1 Stmt. ¶ 32; Def.'s Rule 56.1 Counterstmt. ¶ 32. After the acquisition, Cirne continued to serve as the Chief Technology Officer of CA's Wily Division. Pl.'s Rule 56.1 Stmt. ¶ 33.

Cirne resigned from CA on July 31, 2007. *Id.* ¶ 34. In February 2008, Cirne authorized the incorporation of New Relic and installed himself as Chief Executive Officer (CEO), a position he holds to this day. *Id.* ¶¶ 38, 53; Def.'s Rule 56.1 Counterstmt. ¶ 38. As explained below, the parties dispute, among other things, when Cirne began developing the prototype for the product that eventually became New Relic's commercial APM service and whether Cirne's initial programming contributions still survive in New Relic's commercial offerings. However, there is no dispute that Cirne was the only person involved in developing the first prototype used to launch New Relic, demonstrating the prototype to third parties, and obtaining the first round of capital to fund New Relic. Pl.'s Rule 56.1 Stmt. ¶ 51; Def.'s Rule 56.1 Counterstmt. ¶ 51. Cirne also played a key role in obtaining subsequent rounds of financing for New Relic. Pl.'s Rule 56.1 Stmt. ¶ 52; Def.'s Rule 56.1 Counterstmt. ¶ 52. New Relic commercially released its Java agent in October 2009 and its .NET agent in October 2010. Pl.'s Rule 56.1 Stmt. ¶¶ 67-68. The parties agree that Cirne ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ Pl.'s Rule 56.1 Stmt. ¶¶ 64-66; Def.'s

Rule 56.1 Counterstmt. ¶¶ 64-66.

The parties' generally differ in their assessment of Cirne's involvement in the creation

and development of New Relic's accused Java and .NET agents. The Court will now consider

the party's respective factual recitations.

### A.     CA's Recitation of the Facts

CA asserts that, while Cirne was still an employee at CA and approximately two months

prior to his departure, he began experimenting with the idea of providing APM through a

Software-as-a-Service, or "SaaS" delivery model, as opposed to the on-premise model used to

deliver Introscope. Pl.'s Local Rule 56.1 Stmt. ¶ 35.[6] According to CA, Cirne began writing the

code for his new company (New Relic) during that timeframe. *Id.* ¶ 36. Instead of disclosing his

new invention to CA, Cirne resigned from CA and began demonstrating his prototype to third

parties. *Id.* ¶ 37. Less than two months after leaving CA, Cirne formed an LLC in September

2007 (New Relic's predecessor) before formerly incorporating New Relic in February 2008. *Id.*

¶ 38.

CA maintains that New Relic's APM service and its accused Java and .NET agents

"would not exist but for the knowledge and assistance provided to New Relic by Mr. Cirne." *Id.*

---

[6]     According to CA, "[t]he fundamental difference between SaaS and on-premise is that
SaaS allows customers to monitor their applications by downloading software agents through a
remotely hosted website, whereas on-premise software must be physically installed on the
customers' computers in order to monitor their web applications." Pl.'s Rule 56.1 Stmt. ¶ 35
n.11.

¶ 44. In particular, CA points to the fact that Cirne alone founded New Relic, authorized the incorporation of the company, and installed himself as CEO. *Id.* ¶¶ 38, 45, 53. According to CA, Cirne conceived of the idea for New Relic and wrote the original code for the first prototype used to launch the company in approximately June 2007, while he was still employed at CA, and developed the first prototype used to launch the company. *Id.* ¶ 46. CA asserts that original code remains part of New Relic's commercial product today. *Id.* ¶ 47. CA also notes (and New Relic does not dispute) that prior to New Relic's incorporation, Cirne was the only person developing the original prototype for New Relic, demonstrating that prototype to third parties, and obtaining the first round of capital funding for New Relic. *Id.* ¶ 48-49, 51; Def.'s Rule 56.1 Counterstmt. ¶¶ 48-49, 51. The parties also do not dispute that Cirne played a key role in obtaining New Relic's second, third, fourth, and fifth rounds of financing to fund New Relic's operations. Pl.'s Rule 56.1 Stmt. ¶ 52; Def.'s Rule 56.1 Counterstmt. ¶ 52. CA contends that the funding was used, among other things, to hire engineers to build Cirne's product. *Id.* ¶ 50. Cirne did, indeed, hire New Relic's first set of engineers as well as its first business development manager. *Id.* ¶ 54.[7] Of the first seven "key" personnel hired by Cirne, six were from CA. *Id.* ¶ 55. The engineers from CA included Saxon D'Aubin and Jim Gochee, both of whom CA contends played a "critical role" in developing New Relic's accused Java and .NET agents. *Id.* ¶ 56.[8]

---

[7]    Although the parties agree that Cirne hired New Relic's first engineers, New Relic disputes CA's characterization that the engineers were "needed to develop New Relic's APM service." Pl.'s Rule 56.1 Stmt. ¶ 54; Def.'s Rule 56.1 Counterstmt. ¶ 54.

[8]    New Relic agrees with CA's assertion only to the extent that D'Aubin played a critical role in the development of New Relic's Java agent. Def.'s Rule 56.1 Counterstmt. ¶ 56.

CA further asserts that, from the inception of New Relic, Cirne has been "substantially involved in developing, or managing the development of, all of New Relic's products." *Id.* ¶ 60. In particular, CA alleges that Cirne made the decision to develop the Java agent in order to expand the company's footprint beyond a single software language agent. *Id.* ¶ 71. Cirne also conducted the early research to determine whether New Relic could develop a Java agent compatible with its APM service, and then handed the project to D'Aubin and Gochee, two engineers whom Cirne recruited directly from CA. *Id.* ¶ 72. Cirne put D'Aubin and Gochee in charge of developing and managing New Relic's Java agent, and according to CA, Cirne has acknowledged that both engineers played a critical role in the development and release of the agent. *Id.* ¶ 73. CA also asserts that Cirne wrote code for the Java agent and was directly involved in reaching out to customers to test the Java agent prior to its release. *Id.* ¶ 74. Cirne also made the decision to develop and release New Relic's .NET agent. *Id.* ¶ 75.

**B.    New Relic's Recitation of the Facts**

New Relic generally asserts that it did not rely on Cirne's knowledge or assistance to develop the accused functionality in the Java and .NET agents. *See* Def.'s Rule 56.1 Counterstmt. ¶ 157. New Relic describes Cirne's history and involvement with the company as follows.

### 1.    New Relic's First Product: Ruby-on-Rails Performance Monitoring

With regard to Cirne's alleged experimentation while still working at CA, New Relic contends that, in late June or early July 2007, while on an unpaid leave of absence, Cirne "began to play around with a new programming language called Ruby-on-Rails" ("Ruby"). *Id.* ¶¶ 121. Cirne taught himself Ruby on his own time and on his own computer by experimenting and trying to write code. *Id.* ¶¶ 122-23. After experimenting with Ruby for a few weeks, Cirne "realized that he might want to pursue his Ruby idea so he promptly resigned from CA."

*Id.* ¶ 129.

After resigning from CA, Cirne joined Benchmark Capital ("Benchmark") as an entrepreneur in residence because he "was not certain what his next step would be." *Id.* ¶ 130. By the end of 2007, Cirne's initial experimenting with Ruby became "more directional" toward a Ruby-on-Rails performance monitoring product delivered through an SaaS model. *Id.* ¶ 132. In February 2008, after Cirne obtained funding from Benchmark, New Relic was incorporated. *Id.* ¶ 138. New Relic released its first product, Rails Performance Monitoring ("RPM"), in June 2008. *Id.* ¶ 139. New Relic's RPM product was developed for the small and medium business market and developers interested in SaaS rather than on-premises delivery. *Id.* ¶ 140. According to New Relic, Cirne's earlier experimentation with Ruby was the beginning of research toward what, after many revisions by many people, ultimately became the New Relic RPM product. *Id.* ¶ 125.

In New Relic's view, Cirne was not obligated to disclose his early research related to CA because he was on unpaid leave of absence, and did the work on his own time and computer. *Id.* ¶ 37. Likewise, his idea for a Ruby product did not relate to CA's business. *Id.* Moreover, New Relic asserts that Cirne voluntarily discussed his plans and ideas related to Ruby with certain CA executives over the years in an effort to be "transparent" with CA. *Id.* ¶¶ 134, 136-37. The parties do not dispute that "CA does not accuse any version of New Relic's Ruby agent of infringement." *Id.* ¶ 149; *see* Plaintiff's Reply to Defendant's Rule 56.1 Counterstatement ("Pl.'s Rule 56.1 Reply") ¶ 149. New Relic further points out that CA does not currently have a Ruby APM product in development. Def.'s Rule 56.1 Counterstmt. ¶ 144.

## 2. *New Relic's Reliance on Cirne's Knowledge or Assistance in Developing New Relic's Java or .NET agents*

### a. The Java Agent

According to New Relic, CA accuses two features of New Relic's Java agent of infringing the Stall Detection Patents: (i) a former stall detection feature; and (ii) certain functionality relating to "Apdex," including byte code instrumentation and Apdex metric data accumulation for selected transactions. *Id.* ¶ 162. According to New Relic, D'Aubin wrote the Java agent with "no assistance whatsoever from Mr. Cirne with respect to the accused Java agent functionality." *Id.* ¶ 163.

More specifically, New Relic asserts that, as CEO of New Relic, Cirne's "role with respect to product development varied depending on the product or the feature." *Id.* ¶ 158. Cirne, Gochee, and Mike Malloy were all involved in the decision to develop the Java agent; however, Cirne was "the primary decision maker." *Id.* ¶ 159. Cirne did some early research work to "enable Java code to connect to [New Relic's] Ruby on Rails data collection service." *Id.* ¶ 160 (quotation marks omitted). Cirne then handed the Java project off to D'Aubin, the engineer primarily responsible for developing the Java agent. *Id.* ¶ 161. New Relic contends that D'Aubin wrote the accused Java agent himself with no assistance from Cirne "with respect to the accused Java agent functionality," *id.* ¶ 163, and that Cirne's "early research had nothing to do with the accused Java agent functionality," *id.* ¶ 164. New Relic further maintains that Cirne: (i) "never got involved in the development of the Java agent to the level of reviewing code," *id.* at ¶ 165; (ii) "did not supervise Mr. D'Aubin," who was supervised by Gochee, *id.* ¶¶ 166, 168; and (iii) "suggested Mr. D'Aubin for the [Java agent] project," but did not make "the ultimate decision" to assign him, *id.* ¶ 167.

According to New Relic, the allegedly infringing stall detection feature was so minor that D'Aubin wrote it into the code for the Java agent without discussing it with anyone. *Id.* ¶ 169. In fact, Cirne testified at his deposition that he was not aware that the stall detection feature was in the Java agent until this lawsuit. *Id.* ¶ 172. New Relic further states that, when it received notice of this lawsuit, it removed the stall detection feature in the Java agent "because it was such an unimportant feature there was no downside to removing it." *Id.* ¶ 182. According to New Relic, removal of the stall feature has "had no impact on customers or revenues." *Id.* ¶ 183.

With regard to the Apdex functionality of the Java agent, New Relic similarly contends that D'Aubin wrote that functionality without any assistance from Cirne. *Id.* ¶ 163. As with the stall detection feature, New Relic argues that the Apdex functionality is not an important feature of the Java agent. *Id.* ¶ 186.

### b. The .NET Agent

With regard to the .NET agent, New Relic asserts that CA accuses certain functionality related to the Apdex, including event monitoring and Apdex metric data accumulation for selected transactions. *Id.* ¶ 176. New Relic claims that sometime in early 2010, D'Aubin suggested that he should also write a NET agent. *Id.* ¶ 173. After discussions with Gochee and D'Aubin, Cirne, as CEO, ultimately approved the decision to develop the .NET agent, but "had no other involvement in its development," according to New Relic. *Id.* ¶ 174. New Relic Points out that "Cirne has never written a program in C sharp ("C#"), the programming language for .NET, so he could not have added any value to the technical development" of the agent. *Id.* ¶ 175. New Relic also asserts that D'Aubin wrote the agent in 2010, including the accused .NET agent functionality. *Id.* ¶¶ 176-77.

Finally, with respect to the accused features of both the Java and .NET agents, New Relic asserts that it has already determined that "there are a number of non-infringing alternatives" available. *Id.* ¶ 187. New Relic contends that it could implement any of these alternatives easily with no more than one month of engineering time, *id.* ¶¶ 187, 189, and that the cost do so would be "trivial," *id.* ¶ 190.

## III.  PROCEDURAL HISTORY

CA commenced this action against New Relic on November 12, 2012. *See* DE 1. New Relic filed its Answer asserting an affirmative defense of invalidity on January 4, 2013. *See* DE 8. On February 21, 2013, the parties consented to the jurisdiction of a United States Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636(c). *See* DE 28, 29. Judge Willam D. Wall was then assigned to this case. Upon Judge Wall's retirement, the case was referred to the undersigned for all purposes. *See* DE 93. On May 13, 2014, the parties appeared before this Court for a status conference, during which time the Court set a briefing schedule on the parties' anticipated summary judgment motions. *See* DE 103. After the instant motion was fully briefed and filed under seal on ECF, *see* DE 116-120, 128, the Court heard oral argument and reserved decision, *see* DE 142.

## IV.  LEGAL STANDARD

### A.  Summary Judgment

"The standard for summary judgment in a patent case is the same as in any other case." *CA, Inc. v. Simple.com, Inc.*, 780 F. Supp. 2d 196, 208 (E.D.N.Y. 2009) (citing *Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998)). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986); Fed. R. Civ. P. 56(c). In deciding a summary judgment motion, the role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see, e.g., Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006). A fact is "material" within the meaning of Rule 56 if its resolution "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute over a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322-23; *see, e.g, Zalaski v. City of Bridgeport Police Dept.*, 613 F.3d 336, 340 (2d Cir. 2010); *CA, Inc.*, 780 F. Supp. 2d at 209 (quoting *Celotex*, 477 U.S. at 323). Once the movant has demonstrated that no genuine issue of material fact exists, then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). However, there must exist more than mere "metaphysical doubt as to the material facts" to defeat a summary judgment motion. *Id.* at 586. That is, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248. Thus, only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Id.* at

248; *see also Matsushita*, 475 U.S. at 586. The court deciding a summary judgment motion must draw all reasonable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 249 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal citation omitted).

**B.    Assignor Estoppel**

"[A]ssignor estoppel is an equitable doctrine that prohibits an assignor of a patent or patent application, or one in privity with him, from attacking the validity of that patent when he is sued for infringement by the assignee." *Semiconductor Energy Lab. Co. v. Nagata*, 706 F.3d 1365, 1369 (Fed. Cir. 2013) (citing *Diamond Scientific Co. v. Amrico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988) ("Assignor estoppel is an equitable doctrine that prevents one who has assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity.")); *see Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990). "Under the doctrine, an assignor sued for infringement may not defend or counterclaim that the patent he assigned is invalid or unenforceable." *Semiconductor Energy*, 706 F.3d at 1370 (citing *Diamond Scientific*, 848 F.2d at 1226). The doctrine is premised upon the "implicit representation by the assignor that the patent rights he is assigning (presumably for value) are not worthless." *Diamond Scientific*, 848 F.2d at 1224. Thus, "the primary consideration in . . . applying the doctrine is the measure of unfairness and injustice that would be suffered by the assignee if the assignor were allowed to raise defenses of patent invalidity." *Id.* at 1225; *see Pandrol USA, LP v. Airboss Railway Products, Inc.*, 424 F.3d 1161, 1166 (Fed. Cir. 2005). The decision to apply assignor estoppel in a particular case "requires a balancing of the equities between the parties," a determination which is "committed to the sound discretion of the trial court." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1579 (Fed. Cir. 1993); *see*

16

*Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 412 F.3d 1331, 1337 (Fed. Cir. 2005); *see also Diamond Scientifc*, 848 F.2d at 1225.

The assignor estoppel doctrine "also prevents parties in privity with an estopped assignor from challenging the validity of the patent." *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*,150 F.3d 1374, 1379 (Fed. Cir. 1998) (citing *Diamond Scientific*, 848 F.2d at 1224); *Checkpoint*, 412 F.3d at 1337 (same). "Privity, like the doctrine of assignor estoppel itself, is determined upon a balance of the equities" and is viewed in light of the alleged acts of infringement. *Shamrock*, 903 F.2d at 793; *see Mentor Graphics*, 150 F.3d at 1379. Privity can be found as a matter of law. *See, e.g., Shamrock*, 903 F.2d at 796 (upholding district court's grant of summary judgment on assignor estoppel); *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, No. 10-CV-02868, 2014 WL 4695104, at *5 (D. Colo. Sept. 22, 2014) (finding that the plaintiff is entitled to summary judgment on all but two of the defendants' "affirmative defenses of invalidity on the grounds of assignor estoppel"); *BASF Corp. v. Aristo, Inc.*, 872 F. Supp. 2d 758, 774 (N.D. Ind. 2012) (assignor estoppel and privity are "question[s] for the court to decide and which can be resolved through summary judgment.").

"Whether two parties are in privity depends on the nature of their relationship in light of the alleged infringement." *Mentor Graphics*, 150 F.3d at 1379; *see L-3 Commc'ns*, 2014 WL 4695104, at *2 ("The question of privity examines the nature of the relationship between the assignor and the person sought to be estopped, in light of the alleged infringement."); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10-CV-03428, 2012 WL 2326064, at *4 (N.D. Cal. 2012). As the Federal Circuit explained in *Shamrock*:

> If an inventor assigns his invention to his employer Company A and leaves to join Company B, whether company B is in privity and thus bound by the doctrine will depend on the equities dictated by the relationship between the inventor and company B in light of the act of infringement. The closer that

relationship, the more the equities will favor applying the doctrine to company B.

*Shamrock*, 903 F.2d at 793 (emphasis added) (citation omitted); *see Mentor Graphics*, 150 F.3d at 1379. To determine if the relationship is sufficiently close, courts consider all contacts between the inventor-assignor and the defendant company. *See Mentor Graphics*, 150 F.3d at 1379; *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 838 (Fed. Cir. 1991).

In making a privity determination, the central question is whether the defendant company availed itself of the inventor-assignor's "knowledge and assistance' to conduct the alleged infringement." *Intel Corp.*, 946 F.2d at 839 (quoting *Shamrock*, 903 F.2d at 794); *see Checkpoint*, 412 F.3d at 1337 (same). "[T]he assignor's mere status as an employee of a competitor does not necessarily warrant a finding of privity," but "[p]rivity may exist in a corporation that is founded by the assignor." *L-3 Commc'ns*, 2014 WL 4695104, at *2 (citing *Shamrock*, 903 F.2d at 793); *see Nortel Networks Inc. v. Foundry Networks, Inc.*, 01-CV-10442, 2003 WL 26476584, at *8-9 (D. Mass. Mar. 24, 2003); *see generally Diamond Scientific*, 848 F.2d at 1224 ("The estoppel also operates to bar other parties in privity with the assignor, such as a corporation founded by the assignor."). Moreover, "[p]rivity does not require that the assignor directly design the infringing features of the accused product. . . . . What is significant is whether the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Brocade*, 2012 WL 2326064, at *5 (internal citations and quotation marks omitted); *see Mentor Graphics*, 150 F.3d at 1379 (finding privity between two companies, even though the assignor company did not assist in developing the accused product); *Synopsys, Inc. v. Magma Design Automation, Inc.*, No. C-04-3923, 2005 WL 1562779, at *6 (N.D. Cal. July 1, 2005) ("The Federal Circuit . . . has not required that the assignor be personally involved in

designing the allegedly infringing aspects of a product before finding the doctrine of assignor estoppel applicable").

## V.   DISCUSSION

Although the parties agree that Cirne himself is estopped from asserting that the Stall Detection Patents are invalid, *see* Pl.'s Mem. at 9-11; Def.'s Opp. at 16 n.11; Pl.'s Reply at 2, they dispute whether the record evidence supports a finding of privity as a matter of law between Cirne and New Relic.  In determining whether privity exists between an inventor/assignor and another entity for purposes of assignor estoppel, the Court must evaluate "all direct and indirect contacts," *see Mentor Graphics*, 150 F.3d at 1379, and evaluate the relationship between the inventor/assignor and the entity "in light of the act of infringement," *Shamrock*, 903 F.2d at 793. Critical to the determination of privity is whether the company "availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Intel Corp.*, 946 F.2d at 839 (quoting *Shamrock*, 903 F.2d at 794).

Here, the following facts are undisputed.  Cirne is a listed inventor on the Stall Detection Patents which were assigned to CA when it acquired Cirne's previous company Wily.  Cirne resigned from CA on July 31, 2007 and went on to found New Relic.  Prior to New Relic's incorporation in February 2008, Cirne alone (i) worked on developing the prototype product used to launch the company, (ii) demonstrated that prototype to third parties, and (iii) obtained the initial capital to fund New Relic.  Cirne also played a critical role in obtaining subsequent rounds of financing for New Relic's operations.  After founding New Relic and becoming its CEO, Cirne hired New Relic's first engineers, including former CA engineers D'Aubin and Gochee. Significantly, Cirne conducted initial research on the accused Java agent before handing that project to New Relic engineers, and he served as "primary decision maker" during the

development of that agent. Cirne also approved the decision to develop the accused .NET agent. New Relic commercially released its Java agent in October 2009 and its .NET agent in October 2010. Cirne ███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

█████████████████████

In light of these undisputed facts, CA argues that New Relic sufficiently availed itself of Cirne's knowledge and assistance "in developing its APM service and its Java and .NET agents" to justify a finding of privity as a matter of law. Pl.'s Mem. at 14. CA further asserts that Cirne's role as CEO and founder of New Relic, as well as his "significant equity ownership in the company" – both now and when New Relic was developing the accused Java and .NET agents – "establishes a sufficiently close connection, in and of itself, to warrant a finding of privity." *Id.* at 13-14 (citing *Mentor Graphics*, 150 F.3d at 1379). CA therefore maintains that the doctrine of assignor estoppel bars New Relic from challenging the validity of the Stall Detection Patents.

In response, New Relic argues that, because the record shows that New Relic did not avail itself of Cirne's knowledge or assistance to develop the allegedly infringing functionalities of the accused Java and .NET agents, a genuine issue of fact exists which precludes the application of assignor estoppel against New Relic. *See* Def.'s Opp. at 16. New Relic further argues that where, at a minimum, the parties dispute whether New Relic relied on Cirne's knowledge or assistance to develop the accused functionalities, Cirne's role as founder and CEO of New Relic, by itself, is insufficient to establish privity. *Id.* at 17. New Relic also points to

certain "equitable factors" that, in its view, favor denial of CA's motion, including New Relic's assertion that the accused features are minor and could be easily removed. *See id.* at 16.

As a preliminary matter, the Court concludes that Cirne's undisputed status as founder and CEO of New Relic, as well as his considerable ownership stake in the company, are factors that weigh in favor of finding privity between Cirne and New Relic. *See Shamrock*, 903 F.2d at 794. In *Shamrock*, the Federal Circuit enumerated several factors which justified a finding of privity in that case, including that (i) the assignor/inventor left the plaintiff company for a high-level position at the defendant company; and (ii) the assignor/inventor owned shares in the defendant company. *Id.*; *see Brocade*, 2012 WL 2326064 at *5. Here, it is undisputed that Cirne left CA and founded New Relic, where he serves as CEO and has acted as the "primary decision maker" in the development of New Relic's accused Java and .NET agents. As in *Shamrock*, the fact that Cirne is "far more than a mere employee" of New Relic supports a finding of privity between the company and Cirne. 903 F.2d at 794; *see Nortel*, 2003 WL 26476584, at *9 (noting that inventor/assignor's "involvement in the founding of the [defendant] company" as a factor favoring privity under *Shamrock*); *Eagle Comtronics*, 1991 WL 247551, at *5 (considering the undisputed fact that the inventor/assignor was a co-founder of the defendant company as a factor leading the court "to the inevitable conclusion that privity exists"); *see also L-3 Commc'ns*, 2014 WL 4695104, at *3 (finding "fairly clear evidence of privity" between the defendant company and three assignors/inventors who left the plaintiff company to serve in high-level positions with the defendant company, where they "perform the same functions" as they did for the plaintiff); *Brocade*, 2012 WL 2326064, at *5 (finding that the defendant company "failed to raise a genuine dispute of material fact as to the first *Shamrock* factor" where the assignor/inventor left the plaintiff company to serve as the defendant's Chief Technology Officer). Moreover, the parties

agree that Cirne ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ Although "the Federal Circuit has not

set a minimum percentage ownership threshold for a finding of privity," *Brocade*, 2012 WL

2326064, at *6, it has noted that "[e]ven a party that owns less than a majority of a company's

stock can still exercise effective control over the company's operations," which may justify a

finding of privity. *Mentor Graphics*, 150 F.3d at 1379; *see also Shamrock*, 903 F.2d at 794

(finding the inventor/assignor's ownership of 50,000 shares of the defendant company's stock

was a factor favoring privity without considering the percentage of ownership). In light of this

precedent, the Court finds that Cirne's current and previous ownership stake in New Relic

weighs in favor of finding privity between Cirne and New Relic. *See Brocade*, 2012 WL

2326064, at *6 (finding that, although inventor/assignor's "one million shares or options to

purchase shares" constituted "a less than 1% ownership stake" of the defendant company, the

factor still "weigh[ed] in favor of a finding of privity"); *Eagle Comtronics, Inc. v. Ne. Filter Co.*,

No. 90-CV-573, 1991 WL 247551, at *5 (N.D.N.Y. Nov. 22, 1991) (considering the undisputed

fact that the inventor/assignor "was at all times at least a 50% shareholder" as a factor leading

the court to conclude that privity exists); *see generally L-3 Commc'ns*, 2014 WL 4695104, at *3

(considering in the privity analysis the fact that the three inventors/assignors hold stock in the

defendant company).[9] Accordingly, the Court concludes that, because New Relic has failed to

---

[9]     New Relic correctly notes that Cirne's role as founder/CEO and ownership interest in
New Relic alone would not be sufficient to warrant the application of assignor estoppel, which
requires the balancing of multiple equitable factors. *See* Def.'s Opp. at 20 n.17. However, as the

raise a genuine issue of fact regarding Cirne's status as founder and CEO of New Relic and his

ownership stake in the company, these factors support the existence of privity between Cirne and

New Relic under the doctrine of assignor estoppel.

As noted, the most "significant" factor in the privity analysis "is whether the ultimate

infringer availed itself of the inventor's knowledge and assistance to conduct infringement."

*Intel Corp.*, 946 F.2d at 839 (quoting *Shamrock*, 903 F.2d at 794). Here, Cirne founded New

Relic, conducted initial research on the Java agent, and created the first prototype product

eventually used to launch the company. After incorporating New Relic, Cirne acted as the

"primary decision maker" in the development of New Relic's accused Java agent, and, as CEO,

he approved the decision to develop the accused .NET agent. In other words, Cirne held a "key

role" in developing New Relic's Java and .NET agents that are alleged to infringe the Stall

Detection Patents. *Synopsys*, 2005 WL 1562779, at *8. In light of these undisputed facts, the

Court concludes that New Relic sufficiently availed itself of Cirne's knowledge and assistance in

developing the accused Java and .NET agents so as to support a finding of privity between New

Relic and Cirne.

New Relic contends that, because the parties dispute whether New Relic availed itself of

Cirne's knowledge and assistance in developing the alleged infringing functionalities of the

accused agents, the Court should decline to find privity between New Relic and Cirne as a matter

of law. *See* Def.'s Opp. at 16. However, "[t]he Federal Circuit does not require that the assignor

directly design infringing features of an accused product in order to find privity between the

assignor and the defendant company." *Brocade*, 2012 WL 2326064, at *7 (citing *Mentor*

---

Court discusses below, New Relic also availed itself of Cirne's knowledge and assistance in
developing the accused Java and .NET agents, which tips the equitable balance in favor of
privity.

*Graphics*, 150 F.3d at 1379); *see Synopsis*, 2005 WL 1562779, at *6. This view originates from

the Federal Circuit's decision in *Mentor Graphics*, in which the court found privity between two

companies even though the assignor, Mentor, had no involvement in the creation of the allegedly

infringing product, but only in the marketing and distribution of the product. 105 F.3d at 1376.

In that case, Mentor had assigned a patent for hardware emulation technology ("the '473 patent")

to another company, Quickturn. *See id.* Thereafter, Mentor bought a company, Meta, which had

developed hardware emulation technology independent of Mentor and Quickturn. *See id.* When

Quickturn asserted that Meta's technology infringed the '473 patent Quickturn had purchased

from Mentor, Mentor filed an action for a declaratory judgment of invalidity of the '473 patent.

*See id.* at 1377. The Federal Circuit applied the doctrine of assignor estoppel to bar both Mentor

and Meta from challenging the '473 patent. *See id.* at 1378-79. In doing so, the Federal Circuit

found Mentor was barred because it had assigned the patent to Quickturn for value, and that

Meta was also barred because it was in privity with Mentor. *See id.* at 1378-79. The court

reasoned that privity existed between the two companies because: Mentor owned all of Meta's

stock, "giving Mentor considerable control over Meta's operations"; the two companies shared

personnel; and Mentor approved Meta's budget. *Id.* at 1379. The court also noted that Mentor

acquired Meta for the purpose of marketing the allegedly infringing device in the United States.

*Id.* Thus, even though Mentor had no role in creating the allegedly infringing product, other than

its marketing and distribution, the Court found Mentor was in privity with Meta for purposes of

assignor estoppel. *See id.*

      Courts applying *Mentor* have consistently held that "[p]rivity does not require that the

assignor directly design the infringing features of the accused product." *Brocade*, 2012 WL

2326064, at *7 (citing *Mentor Graphics*, 150 F.3d at 1379); *Synopsis*, 2005 WL 1562779, at *7

(holding that, although the defendant company "contends . . . the patent assignor[] had little involvement in creating the precise components that are alleged to infringe, *Mentor* demonstrates that assignor estoppel may apply even where the assignor had no involvement at all in creating the infringing technology."); *see also Nortel*, 2003 WL 26476584, at \*8-9 (finding privity between the assignor-founder and his company where the founder oversaw the design of the product's hardware, but the alleged infringement occurred in the product's software, where the assignor was actively involved in the design of his company's products during the relevant time period). Significantly, the district court in *Brocade* further stated that the assignor need not have written code for the infringing device to warrant a finding of privity between the assignor and his company. *See* 2012 WL 2326064, at \*5 ("Moreover, whether or not [the inventor-assignor] actually wrote the code to the accused AX Series is also immaterial.") (citing *BASF Corp.*, 2012 WL 1933700, at \*15 (finding privity between consultant and defendant company, even though consultant did not "actually sit down and operate the [infringing product]")).

In light of this line of cases, New Relic has failed to raise a genuine issue of material fact regarding Cirne's role in alleged infringement which would preclude a finding of privity between New Relic and Cirne. It is undisputed that Cirne, as founder and CEO of New Relic, created the prototype of New Relic's first product, obtained funding so that New Relic could develop that product, contributed research toward the accused Java agent, and was substantially involved in the decision to develop both of the company's accused agents. Under the circumstances of this case, "[n]o more is required for the application of assignor estoppel." *Synopsys*, 2005 WL 1562779, at \*8. New Relic asserts that it did not avail itself of Cirne's knowledge and assistance to develop the infringing features of the accused agents. However, the relevant case law simply does not require that Cirne be personally and directly involved in developing the infringing

functionalities for assignor estoppel to apply against New Relic. Thus, even assuming as true

New Relic's assertions that (i) D'Aubin wrote the code for both the stall detection and Apdex

functionalities of the accused Java agent without Cirne's involvement; (ii) Cirne was not aware

that the accused stall detection feature was in the Java agent until New Relic received notice of

this lawsuit; and (iii) Cirne neither wrote code nor assisted D'Aubin in the development of the

.NET agent, Def.'s Opp. at 16-17 (citing Def.'s Rule 56.1 Counterstmt. ¶¶ 157-68, 172, 175,

178), these assertions do not preclude a finding of privity between New Relic and Cirne. *See,*

*e.g., Brocade,* 2012 WL 2326064, at *5, *7.[10] In other words, even if the Court resolved the

parties' dispute over Cirne's role in the development of the alleged infringing features in New

Relic's favor, this issue would not "affect the outcome of the suit under the governing law" or

cause a reasonable jury to return a verdict in favor of New Relic. *Anderson,* 477 U.S. at 248.

Accordingly, the Court concludes that, in light of the critical and substantial role Cirne played in

founding New Relic (*i.e.,* creating its first prototype and authorizing the development of the

accused agents, among other undisputed facts), the record evidence provides sufficient grounds

to support a finding that New Relic is in privity with Cirne under the doctrine of assignor

estoppel.

In further arguing against privity, New Relic asks the Court to consider the broader

equities between Cirne and CA, and identifies facts that, in New Relic's view, "tip the equitable

---

[10]     The Court is unpersuaded by New Relic's attempt to distinguish Cirne from one of the
assignors at issue in *Brocade,* who held the title of "Chief Architect" of the defendant company.
*See* Def.'s Opp. at 20 20, 20 n.16. New Relic asserts that the court in *Brocade* found it
"immaterial" that the Chief Architect-assignor did not write code for the accused product
because, unlike in this case, "the defendant [company] still availed itself of [the assignor's]
knowledge and assistance to develop the accused product." *Id.* at n.16. However, the Court
finds that, like the assignor in *Brocade,* New Relic did, in fact, rely on Cirne's knowledge and
assistance to conduct the alleged infringement – *i.e.,* to create and develop the accused agents –
despite whether Cirne himself developed the infringing features of those agents.

balance in favor of New Relic and against application of the assignor estoppel doctrine." Def.'s Opp. at 16. In particular, New Relic points out that

> (i) New Relic kept CA apprised of its product development, (ii) New Relic intentionally focused its products on a different and emerging market, (iii) the allegedly infringing features were known to CA for years before CA accused those features of infringement, and (iv) the accused features are minor and could be easily removed or redesigned[.]

*Id.*; *see also id.* at 21-22. However, as CA notes in its reply, the determination whether a defendant company is in privity with the inventor and therefore bound by the doctrine of assignor estoppel "depend[s] on the equities dictated *by the relationship between the inventor and [defendant] company*, not the relationship between the inventor and the plaintiff. *Shamrock*, 903 F.2d at 793 (emphasis added). Moreover, "the primary consideration" in applying the doctrine of assignor estoppel is preventing unfairness and injustice to the assignee, *i.e.*, a plaintiff company like CA. *Diamond Scientific*, 848 F.2d at 1225. Here, the Court determines that, for the reasons explained above, the balance of equities as well as the relationship between Cirne and New Relic favor the application of assignor estoppel to bar New Relic from asserting that the Stall Detection Patents are invalid.

In sum, considering the undisputed facts and drawing all reasonable inferences in favor of New Relic as the non-moving party, the Court concludes there is no genuine issue of material fact on the matter of New Relic being in privity with Cirne under the doctrine of assignor estoppel. Accordingly, CA is entitled to partial summary judgment striking New Relic's affirmative defense of invalidity with respect to the Stall Detection Patents based on the principle of assignor estoppel.[11]

---

[11]     New Relic argues in the alternative that, even if it is bound by the doctrine of assignor estoppel, it may still rely on "anticipatory prior art" to defend against CA's infringement claims

## VI.    CONCLUSION

For the foregoing reasons, CA's motion for partial summary judgment striking New

Relic's First Affirmative Defense with respect to the Stall Detection Patents is GRANTED.

**SO ORDERED.**

Dated: Central Islip, New York
          March 30, 2015

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge

---

at trial. Def.'s Opp. at 22-25. CA responds that "[t]his argument is for another day" and notes that, should New Relic attempt to rely on prior art "as a defense to infringement (or for any other purpose), CA will file a motion in limine to exclude that evidence in accordance with the Court's schedule, and New Relic will have an opportunity to respond at that time." CA Reply at 7. Having considered these arguments, the Court concludes that the issue of whether (and to what extent) New Relic may rely on anticipatory prior art as a defense at trial is not ripe for adjudication on this motion.