**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

CA, INC., D/B/A CA TECHNOLOGIES,

                        Plaintiff,

      - against -

NEW RELIC, INC.,

                        Defendant.

------------------------------------------------------------X

**MEMORANDUM DECISION
AND ORDER**

CV 12-5468 (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

**I.**     P<small>RELIMINARY</small> S<small>TATEMENT</small>

      Plaintiff CA, Inc. ("CA") commenced this patent infringement action alleging that

defendant New Relic, Inc. ("New Relic") has infringed three patents regarding an application

performance management ("APM") product which monitors the performance of software

applications. *See generally* Compl. [DE 1]. New Relic has moved for partial summary judgment

in its favor on the issues of patent infringement and validity as to one of the patents-in-suit,

namely, U.S. Patent No. 7,512,935 B1 ("the '935 Patent"), entitled "Adding Functionality to

Existing Code at Exits." *See* Memorandum of Law in Support of Defendant New Relic Inc.'s

Motion for Partial Summary Judgment ("Def.'s Mem.") [DE 113]. As to infringement, New

Relic argues that its accused systems, the Java and .NET agents, do not infringe the asserted

claims of the '935 Patent as a matter of law. *See id.* at 5. As to validity, New Relic argues that

all of the asserted claims of the '935 Patent are invalid as anticipated by a 1999 article by Marcus

Dahm entitled "Byte Code Engineering with the JavaClass API" ("the Dahm article") and by the

associated JavaClass system. *See id.* CA opposes the motion, arguing that genuine issues of fact

exist regarding the claims of infringement and validity. *See generally* Plaintiff's Memorandum of Law In Opposition to New Relic's Motion for Partial Summary Judgment ("CA Opp'n") [DE 125].

Due to the complexity of the technology encompassed by the '935 Patent as well as the issues raised in New Relic's motion, the Court issued an Order, pursuant to Fed. R. Civ. P. 53, appointing Robert Neuner, Esq. as Special Master (the "Special Master") to hear and consider New Relic's motion for partial summary judgment and to issue a Report and Recommendation as to the specific disposition of the issues raised in New Relic's motion and CA's opposition to that motion. *See* September 12, 2014 Order of Appointment Of And Reference To Special Master ("Order of Appointment") [DE 151]. The Special Master held two hearings on the motion and thereafter submitted his Report and Recommendation to the Court. *See* Special Master's Report and Recommendation ("R&R") [DE 154].

Generally speaking, the Special Master recommended that New Relic's motion for partial summary judgment be granted, in part, and denied, in part. *See id.* The Special Master concluded that, as a matter of law, (1) none of the asserted claims of the '935 Patent are infringed by New Relic's Java agent, either literally or under the doctrine of equivalents, and (2) none of the asserted claims are literally infringed by New Relic's .NET agent. *See id.* at 20-23. The Special Master therefore recommended that partial summary judgment of non-infringement be granted, in part, in favor of New Relic on these issues. *See id.* at 26. However, the Special Master concluded that questions of fact remain as to whether the asserted claims of the '935 Patent (1) are infringed by New Relic's .NET agent under the doctrine of equivalents, *see id.* at 23-24; and (2) are invalid as anticipated by the Dahm article and the JavaClass system, *see id.* at 25-26. Accordingly, the Special Master recommended that the Court deny summary judgment to

New Relic on these issues. *See id.* at 26. In light of these recommendations, the Special Master also recommended that the Court re-open discovery to allow the parties' experts to supplement their expert reports on the issue of infringement and to allow the parties to depose the experts on their supplemental reports. *See id.* at 26-27.

Presently before the Court are the parties' objections to the R&R. *See* Defendant New Relic's Objections And Request to Adopt And Modify The Special Master's Report and Recommendation ("New Relic Objs.") [DE 155]; Plaintiff CA's Objections and Response to Special Master's Report and Recommendation ("CA Objs.") [DE 156]. For the reasons set forth in this Memorandum Decision and Order, the Court (1) OVERRULES the objections by CA, and (2) OVERRULES, in part, and SUSTAINS, in part, the objections by New Relic. Further, the Court (1) ADOPTS the R&R, in part, to the extent that it recommends: (a) granting partial summary judgment of non-infringement as to the Java Agent; (b) granting partial summary judgment of non-infringement as to the .NET agent based on literal infringement; and (c) denying partial summary judgment on the issue whether the '935 Patent is invalid because it was anticipated by the Dahm Article and the JavaClass system; and (2) MODIFIES the R&R, in part, to the extent that summary judgment of non-infringement as to the .NET agent under the doctrine of equivalents is granted. The Court further REJECTS AS MOOT the Special Master's recommendation that expert discovery be re-opened in light of the Court's decision to modify the R&R to grant partial summary judgment of non-infringement as to the .NET agent in its entirety. Accordingly, New Relic's motion for partial summary judgment is GRANTED, in part, as to non-infringement, and DENIED, in part, as to the validity of the '935 Patent.

## II.  BACKGROUND

The underlying facts of this case were set out in some detail in Magistrate Judge Wall's January 5, 2014 Memorandum and Order [DE 86] after the claim construction hearing was completed and will not be repeated here. The following background information is derived primarily from the Special Master's R&R[1] and the supporting record evidence. Only those facts necessary for disposition of the issues before the Court are included here.

### A.  The '935 Patent

The '935 Patent was issued to Jeffrey R. Cobb on March 31, 2009 based upon a patent application filed on February 21, 2001. R&R at 2; *see* '935 Patent, annexed as Ex. A to the Declaration of Corey Johanningmeier In Support of New Relic's Motion for Summary Judgment ("Johanningmeier Decl.") [DE 115-1]. The patent was originally assigned to Wily Technology, Inc. ("Wily"). R&R at 2. When Wily was acquired by CA, the patent was assigned first to Computer Associates Think, Inc. and thereafter to CA. *Id.* The field of invention is software for adding performance profiling functionality to existing codes at exits. *Id.*; *see* '935 Patent, Background of Invention, 1:6-8.[2]

The '935 Patent acknowledges that performance profiling software existed prior to the filing date of the '935 Patent. R&R at 3; *see* '935 Patent, Background of Invention, 1:10-67, 2:1-

---

[1]     With one exception noted in footnote three of this Order (and discussed later in further detail), the parties do not object to the Special Master's factual recitation regarding the '935 Patent, the '935 Patent claims, the prosecution history of the patent, the Dahm Article and JavaClass System, and New Relic's accused agents. *See* R&R at 2-13. Accordingly, the Court adopts these portions of the R&R.

[2]     Citations to the '935 Patent refer to the column and line numbers.

8 (describing prior art).  The prior art software involved adding new code to each of the exits in the code.  R&R at 3; *see* '935 Patent, Background of Invention, 1:55-57.  According to the '935 Patent, this prior art technique of "[a]dding performance profiling code to each of the instructions that each can be an exit has its drawbacks," including increasing the amount of code in the software and failing to adequately account for all the possible exits in the code.  '935 Patent, Background of Invention, 1:60-67; 2:1-2; *see* R&R at 3.  Moreover, "[w]hen an error or exception occurs, the normal flow of the method can be halted, in which case none of the explicit exits will be performed and an exit associated with the error or exception will be performed." '935 Patent, Background of Invention, 2:3-6; *see* R&R at 3.

As a solution, the '935 Patent discloses "a system for adding functionality to existing object code . . . so that multiple exits are accounted for."  '935 Patent, Summary of the Invention, 2:19-21.  In particular, the '935 patent describes a way to add functionality to existing object code (specifically, Java byte code) so that the instructions (*i.e.*, exit code) added to the existing code are executed regardless of how the existing object code exits.  *Id.* at 2:26-35; 4:18-24; *see* R&R at 3.

One embodiment of the invention disclosed in the '935 Patent is "try / finally functionality," also referred to in the R&R as "try / finally implementation."  *See* R&R at 3.[3] The '935 Patent describes try / finally functionality as follows:

> Rather than physically insert copies of the stop code at every possible explicit exit, the present invention conceptually encloses the [Java instructions] within a 'try' block and places the stop code within a 'finally' block. This

---

[3]     CA appears to object to the Special Master's description of the '935 Patent to the extent that the R&R, in CA's view, characterizes the '935 Patent "as containing only a single embodiment," *i.e.*, the try / finally functionality.  CA Objs. at 13 (citing R&R at 3).  The Court will address this issue in its discussion of CA's objections.

implementation provides that the stop code will be performed regardless of the exit from the 'try' block, including intentional exits and exceptions.

'935 Patent, Summary of the Invention, 4:18-24; *see id.* at 3:52-55 ("Rather than add many copies of the exit code in different places, the present invention adds exit code using 'try' and 'finally' functionality."). The Special Master provided the following explanation of the try / finally functionality in the R&R:

> Try / finally is a programming language construct. No matter how the code enclosed in the try block exits, the code in the finally block is always executable. The '935 patent illustrates try / finally implementation in a profiling process by adding a single finally handler for all normal and exception exits. In the example given in the patent at column 13:line 28 to column 15:line 16, instructions 16-18 correspond to existing object code. The code corresponding to indices 36-47 represents the finally handler. The added code at indices 19-27 is performed for normal exits in the case where there are no exceptions. This added code calls the finally handler through a jump subroutine (index 21) and the finally handler is executed. Error in the original routine shifts the code flow to the added code (indices 28-35) representing exception exits. This code likewise jumps to index 36 and the finally handler is executed. Whether the code runs through the code executed for normal exits and jumps to instruction 36 and/or runs through the code executed for exceptions and jumps to instruction 36, the finally handler will get executed last. In this described embodiment, the finally handler can be viewed as a section of object code for execution for *all* normal exits as well as for *all* exceptions.

R&R at 4 (emphasis in original).

## B. The '935 Patent Claims

CA has asserted that New Relic's Java and .NET agents infringe 42 claims of the '935 Patent (claims 1-3, 5-9, 11-25, 27-38, and 40-46). *See* R&R at 4; Plaintiff CA, Inc.'s Opening Claim Construction Brief Regarding U.S. Patent Nos. 7,225,361, 7,512,935 And 7,797,580 [DE 40], at 2. Claims 1 and 22 are independent method claims that describe a method implemented on one or more machines for adding functionality to existing object code. R&R at

4; *see* '935 Patent 16:34-50 (claim 1); 18:7-25 (claim 22); *see also* Claim Construction Memorandum and Order [DE 86] (describing claims 1, 22, and 35 as independent claims). Claim 35 describes an independent processor readable storage device that is programmed to perform the method described in claim 1. R&R at 4; *see* '935 Patent 19:18-34.

Prior to the Claim Construction Memorandum and Order, the parties agreed that "exit code" as it appears in the claims means "a section of object code for execution for multiple normal exits as well as for multiple exceptions." Plaintiff CA Inc.'s and Defendant New Relic's Further Amended Joint Claim Construction and Prehearing Statement ("Joint Claim Construction") [DE 83], at 4; *see* R&R at 5 n.2. The parties further agreed that "adding new exit functionality" means "adding new exit code." Joint Claim Construction at 4. A number of the asserted dependent claims limit "exit code" to apply "upon any exit" or to implement "try and finally functionality." R&R at 5 n.2; *see, e.g.*, '935 Patent 17:20-23, 27-29 (claim 13); 18:61-64 (claim 22). The parties agreed in their Joint Claim Construction that "try and finally functionality" as used in the asserted claims means "the execution of a block of code ('finally') regardless how an associated block of code ('try') exits." Joint Claim Construction at 4; R&R at 5 n.2.

Independent claims 1, 22, and 35, and the asserted dependent claims, contain several elements in common. In particular, each of the independent claims requires "adding exit code," or "adding exit functionality" to "existing object code." R&R at 4-5; *see* '935 Patent 16:34-50 (claim 1); 18:7-25 (claim 22); 19:18-34 (claim 35).

Claim 1 of the '935 Patent is illustrative of the asserted independent claims. R&R at 5. It specifies:

|  | A method implemented on one or more machines for adding functionality to existing object code, the method comprising: |
|---|---|
| Step 1 | adding exit code to said existing object code, said existing object code includes a method having original byte code, said exit code is part of a profiling process; |
| Step 2 | adding a new entry in an exceptions data store for said existing object code, said new entry points to said exit code, said exceptions data store is an exception table for said method, said adding a new entry in said exceptions data store includes adding said new entry into said exception table for said method, said new entry indicates a range of indices corresponding to said original byte code, said new entry includes a reference to said exit code and said new entry indicates that said new entry pertains to multiple types of exceptions; and |
| Step 3 | performing said profiling process. |

*Id.*; *see* '935 Patent 16:34-50.

Claim 11 of '935 Patent recites:

A method according to claim 5, wherein:

Said adding exit code and a adding a new entry include adding try
and finally functionality to said original byte code.

'935 Patent 17:20-23.

### C.    The Prosecution History of the '935 Patent

As the Special Master recounted in the R&R, the '935 Patent has a lengthy prosecution

history.  *See* R&R 5-10.  The Court will not recount that entire history here but instead provides

the following background.  During the prosecution, the patent examiner from the United States

Patent Office ("USPTO") rejected the claims in the '935 Patent as anticipated by and/or obvious

in light of Berry U.S. Patent No. 6,663,359 ("Berry I"), Berry U.S. Patent No. 6,728,955 ("Berry

II"), and a 1997 article by Bill Venners entitled "Try-finally Clauses Defined and Demonstrated"

("Venners").  *Id.* at 6-7.  The patent applicant, Cobb, submitted several written responses to the

USPTO in which he, *inter alia*, sought to distinguish his claimed invention from Berry I, Berry

II, and Venners.  *Id.* at 6-8. Cobb also sought to distinguish the subject matter independently

claimed in his patent application from an "Introscope 1.0 product" by Wily ("Wily Introscope

1.0 product"), which the examiner raised as possible anticipation rejection, but ultimately never

cited as a bar to patentability. *Id.* at 8-9. The application claims were eventually amended as

they appear in the '935 Patent. *Id.* at 10.

## D. New Relic's Accused Agents

The parties do not dispute how New Relic's accused Java agent and .NET agent operate.

*See* R&R at 20; CA Objs. at 18. The Special Master describes Java and the operation of New

Relic's Java agent as follows:

> Java is a programming language used to write applications. Java
> source code (by convention in files with a Java file extension) is
> compiled by a compiler into object code, called Java bytecode. Java
> is an object-oriented language, and the template or blueprint for Java
> objects is a class. Each compiled JavaClass creates a class file (with
> a class filename extension) containing the bytecode for the class.
> JavaClasses typically contain one or more Java methods, which are
> routines that can be called. Class files are executed by a Java Virtual
> Machine (JVM), which converts the bytecode into machine code
> that is directly executable on the computer hosting the JVM. Java
> is a platform-independent language, meaning that Java code written
> and compiled on one platform (computer type) will execute on any
> other, dissimilar platform that has a JVM.
>
> As it pertains to this case, the object code that is added by the Java
> agent to the instrumented method calls the appropriate 'finish'
> method on the tracer, which stops the timing mechanism for that
> method. This finish method of a tracer is called when the
> instrumented method completes. The method can complete because
> of a normal return exit or because of an exception. To ensure that
> the finish method of a tracer is called at multiple exits, the
> instrumented method's exit points are each modified such that the
> call to finish the tracer is added. To account for these exits, the Java
> agent adds a try/catch block around the main part of the method. For
> normal exits, the finish method of a tracer is injected into each
> normal exit. For exceptions, the catch block is used to insert the
> finish method of the tracer.

R&R at 12.

New Relic's .NET agent "works somewhat differently than the Java agent." *Id.* Rather than "use[] third-party libraries to insert the finish tracer code at each exit point" like the Java agent, the .NET agent operates as follows:

> [I]n a first pass of the instrumented method, the .NET agent rewrites the method such that any return statement (an exit from that method) jumps to the bottom of that method. In a 'second pass' of the code, the .NET agent adds a call to start a tracer before the instrumented method is called, wraps the instrumented method in a try/catch block, and adds a call to finish the tracer at two 'exit points': in the catch block for exceptions and in the exit code to which the return statements jumped. When it is time to call the method, a tracer is first started, then the method is called, and when the method exits – either normally or by exception – a finish tracer is called that stops the whole tracer.

*Id.* at 12-13.

New Relic's original .NET agent was written in 2010. *Id.* at 22. The original version of the .NET agent (1) inserted jump instructions at each normal exit in the middle of the method which jumped to the bottom of the method, and (2) inserted code for exception exits that is different from the jump instructions and tracer finish call inserted for normal exits of the method that the agent instruments. *Id.*

The .NET agent was rewritten beginning with version 2.9.1 35.0. *Id.* Unlike the original version of the .NET agent, the rewritten version does not insert jump instructions in the method being instrumented, nor does it insert code at any of the exits of the method being instrumented. Instead, as just described, "the rewritten version wraps the original code to be instrumented in a new method, which recursively calls itself." *Id.*

### E.     The Dahm Article and JavaClass System

The Dahm Article and the associated JavaClass System (version 2.5.2) are admitted prior art. *Id.* at 13. The Dahm article discloses that "[t]here are many possible applications for

JavaClass" including, among other "possible application areas," as a general tool for byte code engineering for "examining the run-time behavior of classes by inserting calls to profiling methods into the code." Dahm Article, annexed as Ex. B to Johanningmeier Decl., at 18, § 4; *see* R&R at 13. The Dahm article also discloses a method for adding functionality to existing object code as well as code examples, including a demonstration of how to use the JavaClass API to instrument try-catch functionality in existing object code. *See* Dahm Article at 1-2, 14, 18; R&R at 13. There is also a disclosure of an exception table with the same format and functionality as the exception table disclosed in the JVM Specification. *See* Dahm Article at 9; R&R at 13. To this end, the Dahm Article discloses adding an exceptions table entry that includes a range of indices corresponding to an original byte code method and that indicates that it pertains to multiple types of exceptions. *See* Dahm Article at 6, 9, 15-16, § A.2.3; R&R at 13.

## III.    LEGAL STANDARDS

### A.    The Court's Review of the R&R

Pursuant to Rule 53, the Court, having given the parties notice and the opportunity to be heard, "may adopt or affirm; modify; wholly or partly reject or reverse" the Special Master's R&R. Fed. R. Civ. P. 53(f)(1). The Court decides *de novo* all objections to conclusions of law and findings of fact made or recommended by the Special Master. *See id.* at (f)(3), (4). The Court may set aside the Special Master's ruling on a procedural matter "only for abuse of discretion." *Id.* at (f)(5). The Court reviews the portions of the Special Master's R&R which have no objections for clear error. *See CA, Inc. v. Simple.com, Inc.*, 780 F. Supp. 2d 196, 206 n.1 (E.D.N.Y. 2009) (citing, *e.g.*, *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys.*, 447 F.Supp.2d 329, 331 (S.D.N.Y.2006); *Thomas v. Arn*, 474 U.S. 140, 149 (1985)).

## B. Summary Judgment

"The standard for summary judgment in a patent case is the same as in any other case." *CA, Inc.*, 780 F. Supp. 2d at 208 (citing *Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998)). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986); Fed. R. Civ. P. 56(c). In deciding a summary judgment motion, the role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see, e.g.*, *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006). A fact is "material" within the meaning of Rule 56 if its resolution "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute over a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322-23; *see, e.g, Zalaski v. City of Bridgeport Police Dept.*, 613 F.3d 336, 340 (2d Cir. 2010); *CA, Inc.*, 780 F. Supp. 2d at 209 (quoting *Celotex*, 477 U.S. at 323). Once the movant has demonstrated that no genuine issue of material fact exists, then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). However, there must exist more than mere "metaphysical doubt as to the material facts" to defeat a summary judgment motion. *Id.* at

586.  That is, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248.  Thus, only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment.  *Id.* at 248; *see also Matsushita*, 475 U.S. at 586.  A court deciding a summary judgment motion must draw all reasonable inferences in favor of the nonmoving party.  *Anderson*, 477 U.S. at 249 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal citation omitted).

C.     **Patent Issues**

"When deciding issues in a patent case, a district court applies the law of the circuit in which it sits to nonpatent issues and the law of the Federal Circuit to issues of substantive patent law." *Mich & Mich. TGR, Inc. v. Brazabra, Corp.*, No. 14-CV-5758, 2015 WL 5190931, at *5 (E.D.N.Y. Sept. 4, 2015) (citing *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 856 (Fed. Cir. 1999); *Revlon Consumer Products Corp. v. Estee Lauder Companies*, Inc., No. 00–CV–5960, 2003 WL 21751833, at *7 (S.D.N.Y. July 30, 2003)); *see Paone v. Microsoft Corp.*, 881 F. Supp. 2d 386, 394 (E.D.N.Y. 2012) (quoting *In re Omeprazole Patent Litig.*, 490 F. Supp. 2d 381, 399 (S.D.N.Y. 2007)).  "The court will also apply the law of the Federal Circuit to procedural issues that are 'intimately involved in the substance of enforcement of the patent right.'"  *Mich & Mich*, 2015 WL 5190931, at *5 (quoting *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1303 (Fed. Cir. 2001)).

### 1.     *Infringement*

"A patent is infringed if a single claim is infringed." *Mich & Mich.*, 2015 WL 5190931, at *15 (citing *Grober v. Mako Products, Inc.*, 686 F.3d 1335, 1344 (Fed. Cir. 2012)).  To prove infringement, the patent owner "must supply sufficient evidence to prove that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim."  *Seal-Flex, Inc. v. Athletic Track and Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999).  "Patent infringement, whether literal or by equivalence, is an issue of fact, which the patentee must prove by a preponderance of the evidence." *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011) (citing *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1123 (Fed. Cir. 1985) (en banc) ("The patentee bears the burden of proving infringement by a preponderance of the evidence.")).

Assessing a patent infringement claim involves two relevant inquiries.  *Paone*, 881 F. Supp. 2d at 394.  "'First, the court must construe the patent's claims as a matter of law to determine their proper scope.'"  *Id.* (quoting *Serby v. First Alert, Inc.*, No. 09 Civ. 4229, 2011 WL 4464494, at *4 (E.D.N.Y. Sept. 26, 2011)).  "'Second, a jury generally determines the factual issue of whether infringement has occurred, unless there is no genuine issue of material fact, in which case summary judgment is appropriate.'"  *Id.* (quoting *Serby*, 2011 WL 4464494 at *4.).  "Summary judgment on the ground of noninfringement of a patent . . . may be granted 'where the patentee's proof is deficient in meeting an essential part of the legal standard for infringement liability.'"  *Id.* (quoting *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989)).

"Literal infringement requires that the accused device contain each limitation of the claim exactly; any deviation from the claim precludes a finding of literal infringement." *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed. Cir. 1998); *see Abraxis Bioscience v. Mayne Pharma (USA) Inc.*, 467 F.3d 1370, 1378 (Fed. Cir. 2006). If even "one [claim] limitation is missing or not met as claimed," there can be no literal infringement. *Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed.Cir.1998). "One who does not infringe an independent claim cannot infringe a dependent claim on (and thus containing all the limitations of) that claim." *Becton Dickinson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 798 (Fed. Cir. 1990) (quoting *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989)); *Carotek, Inc. v. Kobayashi Ventures, LLC*, 875 F. Supp. 2d 313 n. 21, 338 (S.D.N.Y. 2012) (quoting *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328–29 n. 5 (Fed. Cir. 2008)) (noting that "[a] conclusion of noninfringement as to the independent claims requires a conclusion of noninfringement as to the dependent claims.").

If literal infringement cannot be proven, a patent may still be infringed under the doctrine of equivalents. *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374 (Fed. Cir. 2014); *see, e.g., In re OxyContin Antitrust Litig.*, 994 F. Supp. 2d 367, 379-80 (S.D.N.Y. 2014) (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997)). Infringement under the doctrine of equivalents requires that the accused method or system contain each limitation of the claim or its equivalent. *See Warner-Jenkinson*, 520 U.S. at 40 (1997) (noting that because each limitation contained in a patent claim is material to defining the scope of the patented invention, a doctrine of equivalents analysis must be applied to individual claim limitations, not to the invention as a whole). "The patentee must prove that the difference between a missing claim element and what is found in the accused product is only

'insubstantial.'" *In re OxyContin*, 994 F. Supp. 2d at 380 (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 610, 70 S. Ct. 854, 94 L. Ed. 1097 (1950)). "A court may grant summary judgment of non-infringement in favor of [the] defendant with respect to [the] plaintiff's theory of infringement under the doctrine of equivalents if no reasonable factfinder could find that 'there is equivalence between the elements of the accused product or process and the claimed elements of the patented invention.'" *Mich & Mich*, 2015 WL 5190931, at *19 (quoting *Eastcott v. Hasselblad USA, Inc.*, 564 F. App'x 590, 590 (Fed. Cir. 2014) (citing *Warner–Jenkinson*, 520 U.S. at 21)).

### 2. Invalidity Based on Anticipation By Prior Art

"Under 35 U.S.C. § 102, a patent may be invalid on the basis that it was anticipated by a prior art." *Nextec Applications v. Brookwood Cos., Inc.*, 703 F. Supp. 2d 390, 421 (S.D.N.Y. 2010), *aff'd* 542 F. A'ppx. 995 (Fed. Cir. 2013). "A patent is invalid for anticipation when the same device or method, having all of the elements contained in the claim limitations, is described in a single prior art reference." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002); *see, e.g.*, *Zenith Electronics Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008) ("Anticipation requires a showing that each element of the claim at issue, properly construed, is found in a single prior art reference."). "For a prior art reference to anticipate a claim, it must disclose all of the limitations of the claim, 'arranged or combined in the same way as in the claim.'" *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012) (quoting *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008)); *see Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1332 (Fed. Cir. 2010) ("Unless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations *arranged or combined in the same way as*

*recited in the claim*, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102." (internal quotation marks and citations omitted.) (emphasis in original)).  This requirement means that "claims cannot be treated as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims that give the claims their meaning." *Therasense*, 593 F.3d at 1332 (internal quotation marks, ellipses, and citation omitted).  Finally, "an anticipating reference must describe the patented subject matter with sufficient clarity and detail to establish that the subject matter existed in the prior art and that such existence would be recognized by persons of ordinary skill in the field of the invention." *Crown Operations*, 289 F.3d at 1375; *see Wm. Wrigley Jr*, 683 F.3d at 1361.

"Each claim of a patent is entitled to a presumption of validity" and a defendant challenging the validity of a patent must therefore "overcome that presumption by establishing the invalidity of the claim by clear and convincing evidence." *Nassau Precision Casting Co. v. Acushnet Co.*, No. 10-CV-4226, 2015 WL 1514257, at *5 (E.D.N.Y. Mar. 31, 2015) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, ⸺ U.S. ⸺, 131 S. Ct. 2238, 2244–46 (2011); *Cognex Corp. v. Microscan Sys., Inc.*, 990 F. Supp. 2d 408, 413 (S.D.N.Y. 2013)).  "Clear and convincing evidence is that which gives the finder of fact an abiding conviction that the truth of the proponent's factual contentions is highly probable." *Nassau Precision*, 2015 WL 1514257, at *5 (quoting *CA, Inc.*, 780 F. Supp. 2d at 209) (internal quotation marks omitted).

Finally, "[a]nticipation is a question of fact," which "makes anticipation often inappropriate for summary judgment." *Id.* at *6 (internal quotation marks omitted).  "A determination that a claim is anticipated involves a two-step analysis: the first step requires construing the claim, and the second step in the analysis requires a comparison of the properly construed claim to the prior art." *Id.* (internal quotation marks omitted).  "Because anticipation

require[s] a showing that each element of the claim at issue is found in a single prior art reference, the legally operative comparison is between the patent claims and the item of prior art[,] not between the allegedly infringing product and the item of prior art." *Id.* (internal quotation marks and alteration omitted).

IV. **THE REPORT AND RECOMMENDATION**

A. **Infringement**

In deciding whether New Relic's accused Java and .NET agents infringed the '935 Patent, the Special Master first addressed CA's interpretation of the parties' agreed-to definition of "exit code." *Id.* at 17-20. He then discussed whether each of the accused agents infringes the '935 Patent literally and under the doctrine of equivalents. *See id.* at 20-24.

1. *Definition of "Exit Code"*

As noted, the parties stipulated that the phrase "exit code" as used in all the asserted claims of the '935 patent means "a section of object code for execution for multiple normal exits as well as for multiple exceptions." *Id.* at 17. In addressing CA's interpretation of that agreed-upon definition, the Special Master stated that, "[v]iewed in a vacuum," the definition could be interpreted "to mean adding the same performance profiling code to each of the instructions that can be an exit," as CA asserts. *Id.* However, the Special Master noted that "[c]laims are not interpreted in a vacuum. They are interpreted in light of the patent specification, the other claims, and the prosecution history of the patent." *Id.* at 17 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2004) (en banc)). The Special Master rejected CA's interpretation of the "exit code" definition because, in his view, CA's interpretation "encompasses prior art acknowledged as such in the '935 [P]atent, the Berry patents cited by the patent examiner, and

the Wily Interscope 1.0. product over which Cobb distinguished his invention." *Id.* (citation omitted).

According to the Special Master, "the claims find support in the example of try/finally implementation in a profiling process by adding a single finally handler for all normal and exception exits." *Id.* The Special Master explained:

> Whereas the agreed upon definition of exit code, *i.e.*, a section of object code for execution for *multiple* normal exits as well as for *multiple* exceptions is more expansive than the disclosed try/finally implementation wherein the same block of code is reached by all of the exits, both normal and exception, the reach of the agreed upon definition does not and cannot embrace the prior systems that were said by the patentee Cobb to patently different from the invention he was claiming.

*Id.* at 17-18 (emphasis in original). The Special Master further noted that Cobb "represented repeatedly" in the '935 Patent itself and during the prosecution of that patent "that adding performance profiling code to each of the instructions that can be an exit was not his invention and actually taught away from his invention." *Id.* at 18. The Special Master concluded that, in doing so, "[Cobb] clearly and unambiguously disclaimed an interpretation of the claims that would read on systems wherein new code is added to each of the exits in the code." *Id.*

Finally, the Special Master concluded that his analysis of the parties' stipulated definition of "exit code" as it relates to the broadest of the asserted claims (claim 1) "does not implicate the doctrine of claim differentiation." *Id.* at 19. The Special Master stated that "[c]laim 1 has a broader scope than claims 11 and 20, which depend from claim 1. Claims 11 and 20 both limit claim 1 to the disclosed try-finally functionality wherein the same block of code is reached by all of the exits, as opposed to a multiplicity of exits which can be all or less than all exits. *Id.* (emphasis in original). The Special Master noted, however, "that claim differentiation is merely a presumption, 'a rule of thumb that does not trump the clear import of the specification.'" *Id.* at

19-20 (quoting *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1323 (Fed. Cir. 2011) (citing *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1359 (Fed. Cir. 2012) (en banc) ("[C]laim differentiation is not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history."))).

### 2. Infringement by the Accused Agents

In determining whether New Relic's accused agents infringed the '935 Patent, the Special Master looked to claim 1 as "representative of the broadest claims in the '935 [P]atent," noting that "[i]f claim 1 isn't infringed by New Relic's Java and .NET agents, then none of the other asserted claims of the '935 patent is infringed." R&R at 20. According to the Special Master, the issue of infringement boils down to whether either or both of the accused agents add "exit code," as that phrase is defined by the parties, to existing object code. *See id.* As explained in further detail below, the Special Master concluded, as a matter of law, that the accused Java agent does not infringe the '935 Patent, either literally or under the doctrine of equivalents, and that the accused .NET agent does not literally infringe the '935 Patent, but that "it is an open question" whether the .NET agent infringes the '935 Patent under the doctrine of equivalents. *Id.*

### a. The Accused Java Agent

The Special Master first determined New Relic's Java agent does not, as a matter of law, literally infringe the asserted claims of the '935 Patent. *See id.* at 21. In reaching this conclusion, the Special Master noted that, although the Java agent "adds new code at each of the normal exits in the instrumented code[,] . . . no section of exit code is ever executed for more than one normal exit or for more than one normal and multiple exception exits." *Id.* at 20. The Special Master therefore concluded that the Java agent does not meet "the stipulated definition of exit code" and does not literally infringe the '935 Patent. *Id.* The Special Master reiterated that

"the stipulated definition of exit code finds support in the disclosed try / finally implementation of the invention," wherein "the exit code is placed in a single finally block which is executed regardless of which normal exit the routine inside the try block takes." *Id.* Although CA argued that the Java agent infringes the '935 Patent by adding code to each of the normal exits, the Special Master rejected this claim because "the patentee Cobb disavowed unambiguously in the '935 patent and the patent's prosecution history, any claim to the prior art methods of adding performance profiling code to each of the exits in the existing code." *Id.* at 20-21. The Special Master also noted that, despite CA's claims to the contrary, the "inlining" technique New Relic implemented in more recent releases of the Java agent does not literally infringe the '935 Patent because that "technique was used in CA's prior art Introscope 1.0 product and Cobb was able to secure the issuance of his '935 patent by distinguishing the try - finally functionality of the '935 patent over the Introscope product." *Id.* at 21. In light of this "clear disclaimer of claim scope," the Special Master determined that the Java agent does not literally infringe the asserted claims of the '935 patent. *See id.*

The Special Master also rejected CA's argument that the Java agent infringed the '935 patent under the doctrine of equivalents. *See id.* at 21-22. He noted that "the doctrine of equivalents cannot be applied to expand claims for purposes of finding infringement if the scope of equivalency would ensnare the prior art or recapture a claim scope that was disclaimed by the patentee to secure the issuance of the patent." *Id.* (citing *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1577-78 (Fed. Cir. 1997); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002)). Here, according to the Special Master, "Cobb unambiguously disclaimed a claim scope that would embrace the acknowledged prior art of adding copies of the exit code at exit points." R&R at 22. Consequently, the Special Master

concluded that the Java agent does not, as a matter of law, infringe the asserted claims of the '935 patent under the doctrine of equivalents. *Id.*

### b. The Accused .NET Agent

The Special Master next determined whether the accused .NET agent infringed the '935 Patent. *See id.* at 22-24. Before undertaking his analysis, the Special Master described the differences between the two versions of the .NET agent – *i.e.*, the original written in 2010 and the rewritten version 2.9.2.35.0 – and noted that, in both versions, "there is one piece of code that is called for the normal exits and another piece of code that is called for the exceptions." *Id.* at 22. The Special Master noted that, "[o]nce again, the issue of infringement by the .NET agents reduces to the proper construction of the definition of exit code," as the parties disputed whether their stipulated definition – "namely, 'a section of object code for execution for multiple normal exits as well for multiple exceptions'" – comprised the .NET agents' method of calling a piece of code for exits and a piece of code for exceptions. *Id.* The Special Master summarized the parties' arguments as follows:

> To New Relic, the article 'a' [as in, 'a section of object code . . . ,'] means that one and only one block of code is reached by all of the exits, both normal and exception. To CA, the article 'a' means one or more as is generally the case where, as here, the claim contains the transitional phrase 'comprising.'

*Id.* at 22-23 (quoting *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351 (Fed. Cir. 2000)).

"In light of the specification and prosecution history of the '935 patent," the Special Master determined that "the article 'a' as used in the agreed-upon construction [of "exit code"] means one and only one." R&R at 23. The Special Master therefore concluded that, "[s]o construed, neither .NET agent literally infringes the asserted claims of the '935 patent" as a matter of law. *Id.*

Turning to the doctrine of equivalents, the Special Master noted that "[u]nlike CA's assertion of infringement against the Java agent, neither the patent specification nor the prosecution history of the '935 patent prevents CA from asserting that the differences between the asserted claims and the .NET agents are trivial and insubstantial." *Id.* The Special Master explained:

> Similar to the '935 patent, the original version of the .NET agent puts a jump instruction at each normal exit. Each normal exit jumps to one piece of code that calls the tracer finish method for the normal exits. The difference from the '935 patent is that the .NET agent inserts code for exception exits that is different from the jump instructions and tracer finish for the normal exits. Likewise, in the new versions of the .NET agent, there is one piece of code that is called for the normal exits and a different piece of code that is called for exceptions.

*Id.* The Special Master therefore determined that "[i]t is for the fact finder to resolve whether the differences are trivial in which case there is infringement or substantial in which case there is no infringement" under the doctrine of equivalents. *Id.* at 23-24.

## B. Validity

The Special Master next turned to New Relic's claim that all the asserted claims of the '935 patent are invalid because the subject matter of each claim is anticipated by the prior art 1999 Dahm article and the JavaClass system. *See id.* at 24-26. The Special Master pointed out that

> [t]he parties have stipulated that the Dahm article discloses: (1) code examples, including a demonstration of how to use the JavaClass API to instrument try - catch functionality in existing object code; (2) an exception table with the same format and functionality as the exception table disclosed in the Java Virtual Machine Specification; (3) a method for adding functionality to existing object code; ( 4) adding an entry to an exceptions table for an existing object code method; (5) adding an exceptions table entry that points to added code; (6) adding an exceptions table entry that includes a range of indices corresponding to an original byte code method; and (7)

adding an exceptions table entry that indicates that it pertains to multiple types of exceptions.

*Id.* at 24.  However, according to the Special Master, the parties disagree on several "salient fact issues whose resolution is crucial to New Relic's defense of anticipation," *id.* at 25.  Those issues are:

- Whether the Dahm article discloses adding exit code to existing object code.

- Whether the Dahm article discloses adding code to byte code for use as part of a profiling process.

- Whether the Dahm article discloses creating a grouping of all or a portion of the existing object code and associating that grouping with exit code to be performed if an exception occurs during execution of the grouping.

- Whether the Dahm article discloses adding start and exit codes that are calls to methods that start and stop profiling processes.

- Whether the Dahm article discloses adding try and finally functionality to existing object code.

- Whether the Dahm article discloses adding new finalization code that is called if a handled exception occurs.

- Whether the JavaClass documentation and code disclose adding exit code to the existing object code.

*Id.* at 25.  According to the Special Master, "[t]he importance of the resolution of the foregoing fact issues is underscored by CA's argument that the Dahm and JavaClass prior art are no more relevant than the prior art considered by the patent examiner and resolved in the patentee's favor."  *Id.*  The Special Master therefore determined that he should "not attempt to resolve" the foregoing "fact issues" and that their outcome should be determined by a jury.  *Id.* at 24-25.

## C.    Conclusion and Recommendation to Re-Open Expert Discovery

For the foregoing reasons, the Special Master recommended as to infringement that the Court (1) grant summary judgment of non-infringement, in part, in New Relic's favor on the issues of whether (a) the asserted claims of the '935 Patent are infringed either literally or under the doctrine of equivalents by New Relic's Java Agent; and (b) the asserted claims of the '935 Patent are infringed literally by New Relic's .NET agent; and (2) deny summary judgment of non-infringement, in part, as to the issue whether the asserted claims of the '935 Patent are infringed by New Relic's .NET agent under the doctrine of equivalents. *Id.* at 26. As to validity, the Special Master recommended that the Court deny New Relic's motion for summary judgment that all of the asserted claims of the '935 patent are invalid as anticipated by the Dahm article and the JavaClass system. *Id.*

The Special Master further recommended that, in light of the fact that the R&R resolves the parties' dispute over the import of their stipulated definition of "exit code," the Court "re-open discovery for the limited purpose of allowing the parties' experts to supplement their expert reports on the issue of infringement and allowing the parties to depose the experts." *Id.* at 26-27.

## V.    THE PARTIES' OBJECTIONS

### A.    Plaintiff's Objections

CA objects to the R&R on several grounds. Primarily, CA disagrees with the Special Master's construction of the parties' stipulated definition of "exit code." *See* CA Objs. at 2-3; 10-15. CA contends that the Special Master's improper "redefinition" of a stipulated term exceeded the bounds of the Court's Order of Appointment. *See id.* at 2. Moreover, according to CA, the Special Master impermissibly narrowed the definition of "exit code" in a way that (1) misstates the scope of the '935 Patent claims; (2) violates the doctrine of claim differentiation;

and (3) incorrectly finds that statements made by the inventor during prosecution of the '935 Patent disclaimed all of the embodiments set forth in the '935 Patent. *See id.* at 10-15. CA therefore asks the Court to reject the Special Master's "narrowed construction" of "exit code." *Id.* at 19.

CA next objects to the Special Master's recommendation that summary judgment on non-infringement be granted, in part, in favor of New Relic. *See id.* at 18-19. In particular, CA asserts that (1) the R&R erroneously concludes that the Java agent does not infringe the asserted claims of the '935 Patent, either literally or under the doctrine of equivalents, and (2) the .NET agent does not literally infringe the asserted claims of the '935 Patent, based on the Special Master's improper construction of "exit code." *See id.* CA argues that, "[b]ecause each of the accused versions of the Java agent and .NET agent add an exception handler containing exit code for exception exits – the accused agents not only read literally on the asserted claims of the '935 Patent, they are also distinct from the prior art relied upon by the Special Master. Accordingly, the Court should reject the Special Master's recommendation to grant summary judgment of non-infringement as to any of the accused agents." *Id.* at 19.

### B.    New Relic's Objections

New Relic takes issue with three aspects of the Special Master's R&R. *See generally* New Relic Objs. First, New Relic objects to the Special Master's recommendation that the Court deny summary judgment of non-infringement, in part, as to New Relic's .NET agent based on the doctrine of equivalents. *See id.* at 2-3; 11-16. New Relic argues that the Special Master's partial denial of summary judgment of non-infringement was made in error because (1) CA waived any argument that the .NET agent infringed under the doctrine of equivalents by failing to raise that claim in its opposition to New Relic's motion for summary judgment; and (2) no

factual dispute exists on this issue because CA failed to offer expert testimony or any other evidence to support a theory of equivalence against the accused .NET agent. *See id.* at 11-16.

Second, New Relic objects to the Special Master's recommendation that summary judgment be denied as to the validity of the '935 Patent. *See id.* at 16-17. In New Relic's view, "the Dahm article and JavaClass disclose the very elements the Special Master concludes are disputed fact issues," and, thus, there are no genuine issues of material fact whether the asserted claims of the '935 patent are invalid as anticipated by this admitted prior art. *Id.* at 17.

Finally, New Relic objects to the Special Master's recommendation that the Court re-open expert discovery to permit the parties' to supplement expert reports now that the Special Master has resolved the parties' dispute as to the construction of "exit code." *See id.* at 17-23. New Relic asserts that CA should not now be permitted to supplement its expert report when it had "ample opportunity" to do so previously (but did not), and when "CA could not now meet its burden on a motion to supplement its expert report pursuant to the federal rules." *Id.* at 17-18. CA also asserts that it would be prejudiced if expert discovery were permitted to be re-opened at this late juncture in the case. *Id.* at 22-23.

## VI. DISCUSSION

### A. The Special Master's Construction of "Exit Code"

CA primarily objects to what it characterizes as the Special Master's impermissible "redefinition" of "exit code," which the parties stipulated means "a section of object code for execution for multiple normal exits as well as for multiple exceptions." *See* CA Objs. at 1-3; 10-17. By focusing his analysis solely on the try / finally implementation, CA argues, the Special Master construed "exit code" in a way that contravenes the parties' agreed-to definition, as well as the '935 Patent's specification, claims, and prosecution history. *See id.* at 12-15. The

crux of these claims is CA's belief that the Special Master incorrectly rejected CA's own interpretation of "exit code," which encompasses the method of adding exit code to the existing object code at each normal exit and adding an exception handler to existing object code for exception exits. *See id.* at 12-13; R&R at 18-19. New Relic, for its part, asserts that the Special Master's construction of "exit code" was proper and urges the Court to adopt this portion of the R&R. New Relic Objs. at 5-11.

Reviewing the R&R *de novo* and fully considering CA's objections, the Court finds that the Special Master did not impermissibly narrow the parties' stipulated definition of "exit code." Rather, for the reasons explained below, the Special Master properly rejected CA's proposed construction of "exit code" because it encompasses prior art and claim scope which was disclaimed in the '935 Patent specification and by the inventor, Cobb, during the prosecution of the '935 Patent.

At the outset, the Court finds unpersuasive CA's argument that the Special Master "exceeded his authority" under the Court's Order of Appointment by "redefin[ing]" a claim term. CA Objs. at 2. In the Order of Appointment, the Court gave the Special Master "broad plenary powers to take all steps necessary or desirable" to resolve New Relic's motion for partial summary judgment, and directed the Special Master to report back "as to the specific disposition of the issues raised in the motion and the plaintiff's opposition to the motion." DE 151. One of the issues raised in the parties' moving papers was whether New Relic's accused agents infringe the asserted claims of the '935 Patent by adding "exit code," as that term is defined by the parties, operative for multiple normal exits and multiple exception exits. *See* New Relic Mem. at 16-25; CA Opp'n at 12-22; New Relic's Reply Brief in Support of Def. New Relic Inc.'s Mot. for Partial Summ. J. ("New Relic Reply") [DE 131], at 8-10. As the Special Master noted in the

R&R, "[t]he parties agreed to the definition of 'exit code' as that term appears in the claims. However, it is clear that the parties disagree about the import of the definition. This report and recommendation resolves the disagreement." R&R at 26. The Court finds that the Special Master acted within his authority by determining the proper construction of "exit code" and that, contrary to CA's claims, he did not "change" the parties' stipulated definition, which the Special Master repeatedly acknowledges throughout the R&R. *See, e.g.*, *id.* at 5, n.5, 17, 19, 20.

Moreover, the Court finds that the Special Master did not err in concluding that CA's interpretation of "exit code" is untenable in light of "the prior art acknowledged as such in the '935 patent, the Berry patents cited by the patent examiner, and the Wily Introscope 1.0 product over which Cobb distinguished his invention." R&R at 17. The Federal Circuit has consistently held that "the best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." *Phillips*, 415 F.3d at 1315 (collecting cases) (quotation marks and alteration omitted). Ultimately, "'[c]laims cannot be construed as encompassing the prior art that was distinguished in the specification and disclaimed during prosecution.'" *Kinik Co. v. Int'l Trade Comm'n.*, 362 F.3d 1359, 1365 (Fed. Cir. 2004) (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.*, Inc., 242 F.3d 1337, 1343–44 (Fed. Cir. 2001)).

As explained in the R&R, CA asserts in opposition to New Relic's motion that "exit code" should be interpreted to mean "adding the same performance profiling code to each of the instructions that can be an exit." *Id.*; *see, e.g.*, CA Opp'n at 14 (disagreeing with New Relic that adding exit code sections at each exit does not satisfy the parties' definition of "exit code"); *id.* at 16 ("New Relic admits that its 'Java agent duplicates exit code at each of the normal exits.'"). However, as the Special Master properly determined, the '935 Patent disclaims this prior art

technique, which Cobb criticized in the "Background of the Invention" section of the specification.  *See* R&R at 3; *see, e.g.*, '935 Patent, Background of the Invention, 1:55-67; 2:1-8. The specification states that "[p]rior art systems that add performance profiling functionality will add new code to each of the exits in the code" and that "[a]dding performance profiling code to each of the instructions that each can be an exit as its drawbacks," which the specification goes on to describe.  '935 Patent, Background of the Invention, 1:55-57, 60-61.  The solution that the specification discloses in the "Summary of the Invention" section is "adding functionality to existing object code . . . so that multiple exits are accounted for."  *Id.* at 2:19-21.  Thus, the specification "distinguish[es] the prior art . . . and point[s] out advantages of the [invention] . . . that [is] the subject of" the '935 Patent.  *SciMed Life Sys.*, 242 F.3d at 1343.  "That discussion in the written description supports the [Special Master's] conclusion that the claims should not be read so broadly as to encompass the distinguished prior art structure."  *Id.*; *see Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1333 (Fed. Cir. 2009) (quoting *Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004). ("'Where the general summary or description of the invention describes a feature of the invention and criticizes other products that lack that same feature, this operates as a clear disavowal of these other products.'").

The Special Master also properly determined that representations made by Cobb during the prosecution of the '935 Patent effectively "disclaimed an interpretation of the claims that would read on systems wherein new code is added to each of the exits in the code."  R&R at 18. "[A] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution . . . , for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art."  *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (collecting cases) (quotation marks and citation

omitted).  As discussed in the R&R, "Cobb represented repeatedly that adding performance

profiling code to each of the instructions that can be an exit was not his invention and actually

taught away from his invention."  R&R at 18.  In particular, in his June 1, 2004 response to the

USPTO's First Office Action rejecting the pending claims as anticipated by and/or obvious in

light of Berry I, Cobb argued to the patent examiner with respect to the try / finally functionality

recited in claim 11 that:

> Berry actually teaches away from Applicant's invention. The 'try'
> and 'finally' clauses were known to the public prior to Berry's patent
> application.  .  .  .  **Berry sought to add 'performance
> instrumentation code at the entry and exit of every method
> contained in the class file.'** (Berry, col. 5, lines 61 -62). **The way
> Berry accomplished that goal was to add a method call to an
> instrumentation library method at each exit from a method**
> .  .  .  .  **Berry does not add try-finally functionality to existing
> object code.**  Try-finally functionality was publicly known prior to
> Berry's invention and Berry chose to solve the problem without
> using try-finally functionality. Thus, **Berry teaches away from
> using try-finally functionality.**
>
> .  .  .  .
>
> Thus, Berry and the current Applicant faced a similar problem.
> **Berry discloses one way to solve that problem- instrument the
> code by adding instructions at every exit.  Applicant specifically
> teaches a different way to solve the problem - add try-finally
> functionality to the object code.**
>
> In summary, Applicant teaches one way to solve the problem. Berry
> teaches another way to solve the problem. As such, Berry teaches
> away from Applicant's invention  . . .

Prosecution History, annexed to Johanningmeier Decl. as Ex. L, at 403487-88 (June 1, 2004

Response to Office Action Under 37 C.F.R. § 1.111) (emphasis supplied); *see* R&R at 6-7.  On

February 21, 2006, in response to another rejection of (and objection to) the pending claims,

Cobb submitted a declaration in which he essentially restated points made in the "Background of

the Invention" section of the specification:  "Prior art systems adding performance profiling

functionality to code with multiple exit points will add new code to each of the exits in the code. This solution poses several drawbacks." Johanningmeier Decl., Ex. L, at 403737 (Declaration of Jeffrey R. Cobb under 37 C.F.R. §1.132, dated February 15, 2006, at ¶ 14); *see* R&R at 8. Finally, in a second declaration submitted in response to the patent examiner's communication regarding the Wily Introscope 1.0 product, Cobb sought to distinguish the subject matter claimed in the '935 Patent application from Introscope 1.0 by stating the following:

> Generally speaking, Introscope 1.0 performs inline injection of code to add performance profiling functionality. Introscope 1.0 employs techniques such as class substitution, static method call replacement and filed replacement to inject performance profiling functionality inline to the existing code. More specifically, these techniques add exit functionality to existing code by identifying the explicit exit points in the code and then adding the new exit functionality at each of these identified points. These techniques are similar to the prior art described in the background of the present application that 'will add new code to each of the exits in the code.' *See* Specification, page 2, lines 21-22.

Johanningmeier Decl., Ex. L, at 403778-79 (Second Declaration of Jeffrey R. Cobb under 37 C.F.R. §1.132, at ¶ 10); *see* R&R at 8-9. In other words, Cobb asserted that Introscope 1.0. used the prior art technique disclosed in the '935 Patent specification, while Cobb's invention did not.

CA argues that, contrary to the Special Master's findings, "Cobb's statements distinguishing several prior art references during prosecution do not constitute disclaimer." CA Objs. at 16. Specifically, CA asserts that Cobb's statements which are quoted in the R&R were squarely aimed at "distinguishing the dependent claims (*e.g.*, claim 11) that explicitly reference 'try and finally functionality,'" and were not directed at (and therefore did not operate to disclaim) the other, broader embodiments disclosed and claimed in the '935 Patent. *Id.* CA further points out that, "with respect to the broadest claims, *e.g.*, independent claim 1, Mr. Cobb distinguished the prior art without mention of 'try / finally' at all." *Id.* Ultimately, CA argues

that the record reveals "no clear and unmistakable disclaimer" and "[a]t best, [Cobb's] statements from the '935 Patent's prosecution history are subject to multiple reasonable interpretations and cannot, as a matter of law, form the basis of disclaimed subject matter." *Id.* at 17 (citing *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013)).

The Court disagrees. CA is correct that "[p]rosecution disclaimer does not apply to an ambiguous disavowal" such as when "for example, . . . the applicant simply describes features of the prior art and does not distinguish the claimed invention based on those features." *Computer Docking Station Corp.*, 519 F.3d at 1375 (citing *Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1337 (Fed. Cir. 2005)). However, that is not the case here where, as noted, Cobb described in detail how the features of the invention recited in his patent application differed from the features of the prior art. *See, e.g.*, Johanningmeier Decl., Ex. L, at 403487-88, 403778-79. Moreover, the fact that Cobb referenced prior art in an attempt to distinguish Berry I from the try / finally functionality recited in claim 11, *see* Johanningmeier Decl. as Ex. L, at 403487-88; 403740; *see also* R&R at 6-7, does not demonstrate that Cobb's disavowal of the prior art method of "adding instructions to every exit" is limited to that dependent claim and not the independent claim 1. This is particularly true in light of the fact that Cobb generally disclaimed this prior art technique both in his first declaration and in the background of the specification. *See* Johanningmeier Decl., Ex. L, at 403737;'935 Patent, Background of the Invention, 1:55-67; 2:1-8. Finally, the Federal Circuit has observed that, although applicants may "distinguish[] their invention from the prior art in multiple ways[,] . . . a disavowal, if clear and unambiguous, can lie in a single distinction among many." *Computer Docking Station Corp.*, 519 F.3d at 1377 (citing *Andersen Corp. v. Fiber Composites*, LLC, 474 F.3d 1361, 1374 (Fed. Cir. 2007); *Norian*

*Corp. v. Stryker Corp.*, 432 F.3d 1356, 1362 (Fed. Cir. 2005) ("[W]e have not allowed [patentees] to assert that claims should be interpreted as if they had surrendered only what they had to.")). Thus, even though Cobb made arguments distinguishing the independent claims without referencing to the try / finally functionality, as CA points out, Cobb's disavowal of the prior art during the prosecution was "clear and unambiguous" such that it disclaimed any interpretation of those independent claims which encompasses adding new code to each exit in the code. *Computer Docking Station Corp.*, 519 F.3d at 1377.

CA opposes the Special Master's analysis of "exit code" on several additional grounds, none of which the Court finds persuasive. Primarily, CA contends that the Special Master failed to consider that none of the prior art referenced in the R&R "added both code at normal exits and an exception handler to the existing object code to execute exit code for exception exits." CA Objs. at 12. On this point, "CA contends that adding an exception handler to existing object code – performed by each of the accused New Relic agents – was not disclosed in the prior art discussed in the Report and Recommendation," and therefore was not disclaimed by that prior art. *Id.* at 13.

Contrary to CA's claim, the Special Master considered and properly rejected this argument. *See* R&R at 18 ("[T]he premise of CA's argument is that the '935 patent discloses as alternatives for the handling of normal exits the prior art technique of adding exit code to the existing object code at each normal exit and the technique of adding try-finally functionality to the existing object code, with either alternative also including the addition of a new entry in an exception data store for exceptions exits."). As the Special Master concluded, CA's contention that the independent claims of the '935 Patent "are infringed by any process which includes as a first step the prior art technique of adding exit code to the existing object code at each normal

exit and as a second step the novel technique of adding an exception handler" to existing object code "read[s] out of existence the contradictory specification of the '935 [patent], the contradictory prosecution history of the '935 patent, and the contradictory stipulated meaning of the term exit code namely, a section of object code for multiple normal exits as well as for multiple exceptions." *Id.* at 18-19. Moreover, CA does not even address the Special Master's additional finding that its prior art/exception handler argument is "plainly at odds with the position CA has taken with respect to validity." *Id.* at 19. Quoting from CA's opposition brief, *see* CA Opp'n at 5, the Special Master noted that in distinguishing the Dahm article, CA represented the following:

> Instead, New Relic argues that Dahm and JavaClass disclose object code operable for multiple exits and multiple exceptions because 'Dahm discloses that JavaClass could insert or append new code at any existing instruction.' New Relic's Motion at 11. **However, the Background of the Invention identifies [that] this approach was not only known in the prior art, but was part of the problem to be solved, and not the invention.** Ex. 5, U.S. Patent No. 7,512,935 ("935 Patent") at 1:60-61. **'Adding performance profiling code to each of the instructions that each can be an exit has its drawbacks.'**

R&R at 19 (emphasis supplied); CA Opp'n at 5. Claims must be interpreted the same way for both validity and infringement. *Id.* (citing *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("It is axiomatic that claims are construed the same way for both invalidity and infringement."); *CR. Bard, Inc., v. M3 Sys, Inc.*, 157 F. 3d 1340, 1363 (Fed. Cir. 1998)). Thus, CA cannot credibly assert that "append[ing] new code at any existing instruction" is embodied by the prior art referenced in the patent specification for purposes of validity, while simultaneously asserting that the accused agents infringe the '935 Patent by employing that same prior art technique. CA Opp'n at 5.

CA next argues that the Special Master erred by disregarding all but the narrowest embodiment in the '935 Patent – *i.e.*, the try / finally implementation – when the '935 Patent explicitly discloses other embodiments. CA Objs. at 13 (citing '935 Patent 2:26-32; 2:36-44; 2:46-51.). "This central flaw undermines the Special Master's infringement analysis," according to CA, because "[w]hile the dependent claims drawn to the 'try and finally functionality,' *e.g.*, claim 11, do indeed find support in the 'try/finally' implementation, the remaining independent and dependent claims find explicit support in the other embodiments disclosed in the specification." *Id.* at 14. To this end, CA further asserts that the effect of the Special Master's construction of "exit code" "is to read the 'try/finally' limitation into every claim of the '935 Patent, which violates the doctrine of claim differentiation." *Id.* at 15.

The Court is not persuaded by these arguments. The Special Master did not state that the try / finally functionality was the only embodiment recited in the patent specification, nor did he err by looking to the try /finally implementation to support his analysis of the parties' agreed-to definition of "exit code." *See* R&R at 20. "[W]hen the specification describes the invention in broad terms, accompanied by specific examples or embodiments, the claims are generally not restricted to the specific examples or the preferred embodiments **unless that scope was limited during prosecution**." *Kinik*, 362 F.3d at 1364 (emphasis supplied). As the Special Master stated, although the parties' "agreed upon definition of exit code . . . is more expansive than the disclosed try / finally implementation wherein the same block of code is reached by all of the exits, both normal and exception, the reach of the agreed upon definition does not and cannot embrace the prior art systems that were said by the patentee Cobb to be patentably different from the invention he was claiming." *Id.* at 16-17.

CA's claim differentiation argument is also unavailing. "The doctrine of claim differentiation stems from 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'" *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) (quoting *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971–72 (Fed. Cir. 1999)). However, "the doctrine 'only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction.'" *Id.* (quoting *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000)). As the Special Master pointed out, "'the doctrine of claim differentiation cannot broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence.[']" *Id.* (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998)); *see Eon-Net*, 653 F.3d at 1323 ("'[C]laim differentiation is a rule of thumb that does not trump the clear import of the specification.'") (quoting *Edwards Lifesciences*, 582 F.3d at 1331). Here, any perceived inconsistency between the Special Master's construction of "exit code" and the language of claim 1 amounts, at most, "to a conflict between teachings in the specification and the doctrine of claim differentiation," which will not overtake the "contrary construction dictated by the written description or prosecution history" at issue in this case. *Marine Polymer*, 672 F.3d at 1359.

Finally, CA argues that the Special Master erred in finding "that 'a section' as used in the parties' agreed construction [of "exit code"] means 'one and only one section,' despite the repeated teaching in the '935 specification – including through the ignored embodiments – supporting a broader meaning for 'a' of 'one or more.'" CA Objs. at 14. According to CA, "[t]he Special Master then used this finding to justify excising from the '935 Patent the broader embodiments because they do not utilize a single, solitary section of exit code. The Federal

Circuit, however, has held that 'a' means 'one or more' as a matter of law, particularly as here, where the claims use the open phrase "comprising.'" *Id.* at 14-15 (quoting *KCJ Corp.*, 223 F.3d at 1356).

Again, the Special Master properly rejected this argument. *See* R&R at 22-23. As stated in the R&R (and discussed at length here), the specification and the prosecution history of the '935 Patent foreclose interpreting the parties' definition of "exit code" to mean "one or more" sections or blocks of code are reached by all exits, a method which encompasses prior art. Moreover, in a case decided more recently than *KCJ Corp*, the Federal Circuit noted that its prior precedent "does not set a hard and fast rule that 'a' always means one or more than one. Instead, we read the limitation in light of the claim and specification to discern its meaning." *Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011). The Court went on to state that "[w]hen the claim language and specification indicate that 'a' means one and only one, it is appropriate to construe it as such even in the context of an open-ended 'comprising' claim." *Id.* The Special Master relied upon this reasoning in the R&R, *see* R&R at 23, and the Court finds no reason to disturb that finding.

For the foregoing reasons, CA's objections regarding the Special Master's construction of "exit code" are OVERRULED, and the Court hereby ADOPTS the Special Master's construction of "exit code" as set forth in the R&R.

**B.     The Special Master's Recommendation That Summary Judgment of Non-Infringement Be Granted As To The Java Agent**

CA next objects to the Special Master's recommendation that summary judgment of non-infringement be granted as to the Java agent. *See* CA Objs. at 17. The Special Master concluded that the Java agent does not infringe the asserted claims of the '935 Patent either literally or under the doctrine of equivalents. *See* R&R at 20-22. CA appears to object only to the Special

Master's determination as to literal infringement, arguing that, because "the New Relic Java agent adds exit code at each of the normal exits of an instrumented method and adds an exception handler containing exit code for exception exits of the instrumented method . . . [t]he Java agent literally meets the parties' agreed construction of 'exit code,' and therefore clearly infringes that limitation of the asserted claims." CA Objs. at 17. CA therefore contends that "New Relic's motion for partial summary judgment with respect to the Java agent should be denied." *Id.* New Relic, meanwhile, urges the Court to adopt the Special Master's recommendation that New Relic's motion for summary judgment of non-infringement be granted as to the Java agent for literal infringement and infringement under the doctrine of equivalents. *See* New Relic Objs. at 5-6.

After reviewing the record and the applicable law *de novo*, the Court agrees with the Special Master that the accused Java agent does not literally infringe the '935 patent as a matter of law. *See* R&R at 20-22. As the Special Master stated (and CA does not dispute), "the Java agent adds new code at each of the normal exits in the instrumented code" and "[w]hen code is placed at each normal exit, no section of exit code is ever executed for more than one normal exit or for more than one normal and multiple exception." R&R at 20. In other words, the Java agent inserts duplicate code at every normal exit and no section of code is executed for more than one normal exit. *See id.* at 20-21. Although CA asserts that placing duplicate code at every normal exit satisfies that parties' definition of "exit code," the Special Master properly rejected that argument in light of the clear disclaimer of scope in the patent specification as well as disclaimer during the prosecution of the patent. *See* R&R at 21 ("[T]he implications of this argument are foreclosed to CA, as the patentee Cobb disavowed unambiguously in the '935 patent and the

patent's prosecution history, any claim to the prior art methods of adding performance profiling code to each of the exits in the existing code.").[4]

Finally, although CA has not objected to the Special Master's determination that the Java agent does not infringe under the doctrine of equivalents, the Court adopts this determination upon *de novo* review. In particular, the Court agrees with the Special Master that CA may not advance a theory of infringement under the doctrine of equivalents which captures, or ensnares, prior art. *See Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374-75 (Fed. Cir. 2014) (citing *Marquip, Inc. v. Fosber Am., Inc.*, 198 F.3d 1363, 1367 (Fed. Cir. 1999)); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1322 (Fed. Cir. 2009) ("Ensnarement bars a patentee from asserting a scope of equivalency that would encompass, or 'ensnare,' the prior art.") (internal citations omitted). Likewise, CA cannot recapture through the doctrine of equivalents subject matter which the applicant surrendered during prosecution. *See Integrated Tech. Corp. v. Rudolph Technologies, Inc.*, 734 F.3d 1352, 1356 (Fed. Cir. 2013) *cert. denied*, —— U.S. ——, 134 S.Ct. 2873 (2014) (citing *Festo Corp.*, 535 U.S. at 734; *Wang Labs.*, 103 F.3d at 1577; *Pall Corp. v. Micron Separations*, 66 F.3d 1211, 1218 (Fed. Cir. 1995). Here, the Special Master properly determined that "Cobb unambiguously disclaimed a claim scope that would embrace the acknowledged prior art of adding copies of the exit code at exit points. Thus, as a matter of law, the Java agent does not infringe the asserted claims of the '935 patent under the doctrine of equivalents." R&R at 22.

---

[4]     The Special Master also rejected CA's argument that the "inlining" technique used in more recent releases of the Java agent literally infringed the '935 Patent, noting that Cobb specifically disclaimed this prior art technique during the patent prosecution when he addressed the Wily Introscope 1.0 product. *See* R&R at 21. CA does not appear to object to this conclusion. *See* CA Objs. at 17. In any event, the Court agrees with the Special Master that the Java agent does not infringe the '935 Patent by "inlining" and the Court therefore ADOPTS this determination.

For the foregoing reasons, CA's objections to the Special Master's recommendation that summary judgment of non-infringement be GRANTED as to New Relic's Java agent are OVERRULED, and the Court hereby ADOPTS the Special Master's recommendations. Accordingly, New Relic's motion for partial summary judgment of non-infringement is GRANTED, in part, as to the Java agent.

**C.      The Special Master's Recommendation That Summary Judgment of Non-Infringement Be Granted, In Part, as to the .NET Agent For Literal Infringement**

CA's final objection is to the Special Master's recommendation that summary judgment of non-infringement be granted, in part, as to the .NET agent for literal infringement. *See* CA Obj. at 18-19. CA does not dispute the Special Master's description of how the two versions of the .NET agent – *i.e.*, the original version and later beginning with 2.9.135.0 – operate. *See id.* at 18. However, CA argues that, contrary to the Special Master's conclusions, both versions of the .NET agent "literally meet the 'exit code' limitation, and therefore infringe" the accused claims of the '935 Patent. *Id.* at 19. On the other hand, New Relic asserts that the Special Master's determination that the .NET agent does not literally infringe the '935 Patent is proper and should be adopted by the Court. *See* New Relic Objs. at 6.

Upon reviewing the record and the applicable law *de novo*, the Court agrees with the Special Master that neither version of the .NET agent literally infringes the '935 Patent as matter of law. As discussed *supra*, the Court has already adopted the Special Master's determination that the article "a" used in the parties' definition of "exit code" means "one and only one." *See* R&R at 23 (internal quotation marks omitted). Applying that construction to the operation of the .NET agent, it is clear that the agent does not meet the parties' definition of "exit code" because both versions of the accused agent use different exit code for normal and exception exits. *See id.*

For the foregoing reasons, CA's objections to the Special Master's recommendation that summary judgment of non-infringement be GRANTED, in part, as to New Relic's .NET agent for literal infringement are OVERRULED, and the Court hereby ADOPTS the Special Master's recommendation. Accordingly, New Relic's motion for partial summary judgment of non-infringement is GRANTED, in part, as to the .NET agent for literal infringement.

**D. The Special Master's Recommendation That Summary Judgment of Non-Infringement Be Denied, In Part, as to the .NET Agent Under the Doctrine of Equivalents**

Although the Special Master recommended awarding summary judgment of non-infringement as to the Java agent, and to the .NET agent as to literal infringement, he concluded that a question of fact remains whether the .NET agent infringed the asserted claims of the '935 Patent under the doctrine of equivalents. R&R at 23. Specifically, the Special Master stated that "[u]nlike CA's assertion of infringement against the Java agent, neither the patent specification nor the prosecution history of the '935 patent prevents CA from asserting that the differences between the asserted claims and the .NET agents are trivial and insubstantial." *Id.* (emphasis added). The Special Master therefore recommended that summary judgment of non-infringement be denied, in part, as to the .NET agent based on the doctrine of equivalents. *See id.* at 23-24.

New Relic objects to this recommendation on two grounds. First, New Relic argues that CA has waived any doctrine of equivalents argument with respect to the .NET agent by failing to raise that argument either in opposition to New Relic's motion for partial summary judgment, or before the Court at the July 23, 2014 summary judgment, or in the declaration of its expert, Dr. Owen Astrachan. *See* New Relic Objs. at 11-14. Second, New Relic asserts that, "even if an equivalents argument for the .NET agent[] had properly been argued by CA, it would necessarily

fail as a matter of law because neither of CA's technical expert witnesses has any opinion to support a finding of substantial similarity." *Id.* at 14.  According to New Relic, "CA's experts simply have no stated opinion — in opposition to the present motion or indeed anywhere in the closed expert discovery record of this case — that could support the possible doctrine of equivalents argument currently left open by the draft Report and Recommendation.  CA had the burden and chose not to present this argument." *Id.* at 15.  New Relic raised these arguments before the Special Master in its comments to the Special Master's Draft R&R.  *See* Defendant New Relic's Comments on the Draft Special Master's Report and Recommendation ("New Relic Cmts.") [DE 155-3], at 1-6.  However, the Special Master did not address New Relic's arguments in his R&R.  Moreover, CA does not address the propriety of the Special Master's decision to deny summary judgment of non-infringement, in part, as to the .NET agent.  *See generally* CA Objs.

Having reviewed the record *de novo*, the Court finds that New Relic correctly asserts that CA does not argue in opposition to the instant motion for partial summary judgment that the .NET agent infringes under the doctrine of equivalents.  New Relic's motion states broadly that "New Relic's Java and .NET agents do not infringe the asserted claims, as a matter of law, either literally or under the doctrine of equivalents."  New Relic Mem. at 1.  In its memorandum in opposition, CA disputes, *inter alia*, whether the Java agent infringes under the doctrine of equivalents.  CA Opp'n at 16-18.  As for the two versions of the .NET agent, CA argues only that both versions literally infringe the asserted claims of the '935 Patent.  *See id.* at 22 ("even in the case that a different tracer finish call is executed for exception exits than for normal exits, the .NET agent still practices 'exit code' as construed by the parties").  Moreover, CA's infringement expert, Dr. Astrachan, does not address whether the .NET agent infringes under the

doctrine of equivalents in his declaration submitted in support of CA's opposition to New Relic's motion. *See* Declaration of Owen L. Astrachan in Support of Plaintiff CA, Inc.'s Opposition to Partial Summary Judgment ("Astrachan Decl.") [DE 125-2]. In his declaration, Dr. Astrachan "clarifies" his position regarding the operation of the original and rewritten .NET agents as compared to the position set forth in his initial report. *See id.* at ¶¶ 3-6. Dr. Astrachan ultimately concludes that both versions of the .NET agent practice "exit code" as that term is defined by the parties and that the .NET agent therefore literally infringes the '935 patent. *See id.* ¶ 5-7. However, Dr. Astrachan does not make an argument as to the doctrine of equivalents with respect to the .NET agents. In short, no doctrine of equivalents argument regarding the .NET agent appears anywhere in CA's submissions on the instant motion.

The Special Master appears to have tacitly recognized this fact in his R&R. In recommending that summary judgment be denied, the Special Master stated that "neither the patent specification nor the prosecution history of the '935 patent *prevents CA from asserting* that the differences between the asserted claims and the .NET agents are trivial and insubstantial." R&R at 23 (emphasis supplied). Since CA has not, in fact, raised an equivalents argument with respect to the .NET agent, the Court takes the Special Master's statement to mean that CA is not prevented from asserting a doctrine of equivalents claim at trial, even if CA did not address the issue in opposition to summary judgment. The Court notes that the Special Master has recommended that expert discovery be re-opened for the limited purpose of allowing the parties' experts to address infringement in light of the R&R's construction of "exit code." *Id.* at 25-26. The only infringement issue which the Special Master recommends as surviving summary judgment is whether the .NET agent infringes under the doctrine of equivalents. *See id.* at 23.

Thus, the recommendation to re-open discovery appears squarely aimed at allowing the parties to develop expert evidence on this issue.

New Relic maintains that CA has waived any claim that the .NET agent infringes under the doctrine of equivalents by failing to raise that claim, or cite any evidence in support of that claim, in opposition to summary judgment. In support of this argument, New Relic primarily relies on three appellate cases – *Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372 (Fed. Cir. 2005); *Palmieri v. Lynch*, 392 F.3d 73 (2d Cir. 2004); and *Electro Scientific Indus., Inc. v. Gen. Scanning Inc.*, 247 F.3d 1341 (Fed. Cir. 2001)[5] – which held that the appellant had "waived" arguments not raised before the district court in opposition to a motion for summary judgment. *See Boss Control*, 410 F.3d at 1380 ("Because Boss failed to present substantive arguments to the district court concerning infringement under the doctrine of equivalents, we hold that Boss waived the issue."); *Palmieri*, 392 F.3d at 86-87 (plaintiff's argument that the district court's "dismissal of his § 1985 claim was premature because he was afforded no discovery" was "waived" because the plaintiff "failed to pursue appropriate remedies below for inadequate discovery []or . . . raise this argument in his opposition to summary judgment); *Electro Scientific*, 247 F.3d at 1349-50 (argument which the defendant failed to raise in opposition to the plaintiff's summary judgment motions had been "waived " and would not be considered by the Court "on appeal").

Of the three cases cited by New Relic, *Boss Control* presents circumstances which are most factually similar to this case. In *Boss Control*, the district court, *inter alia*, granted defendant Bombardier's motion for summary judgment of non-infringement with respect to

---

[5] The Court notes that although New Relic cited *Palmieri and Electro Scientific* in its comments to the Special Master, it did not cite *Boss Control*. *See* New Relic Cmts. at 4.

literal infringement, but did not address infringement under the doctrine of equivalents. *Id.* at 1376-77. Boss appealed the district court's grant of summary judgment of non-infringement to the Federal Circuit, arguing, as relevant here, "that the district court's failure to determine infringement under the doctrine of equivalents constitutes reversible error." *Id.* at 1380. Bombardier argued in response that "Boss cannot rely on the doctrine of equivalents because Boss did not rely on it before the district court in opposing summary judgment." *Id.*

The Federal Circuit agreed with Bombardier that Boss Control had waived the issue of infringement under the doctrine of equivalents. *See id.* The Court found that "Boss failed to present any arguments concerning the doctrine of equivalents to the district court," either "in its complaint or in its two briefs to the district court on the issue of summary judgment of noninfringement." *Id.* The Court noted that "[t]he only mention of the doctrine of equivalents in either brief is in one sentence that states that '[a] patent claim can be infringed in two ways, literally or under the doctrine of equivalents.'" *Id.* The Court noted that "[t]his single reference to the doctrine of equivalents in Boss's briefs, without further argument specifically addressing infringement under the doctrine of equivalents or referencing evidence showing infringement under the doctrine of equivalents, does not present anything for this court to 'review.'" *Id.* (quoting *Sage Prods. Inc. v. Devon Indus.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) (noting that, with few exceptions, "this court does not 'review' that which was not presented to the district court")). Accordingly, the Court held that, "[b]ecause Boss failed to present substantive arguments to the district court concerning infringement under the doctrine of equivalents, . . . Boss waived the issue." *Id.*

New Relic now cites *Boss Control* for the proposition that, because CA did not argue in opposition to New Relic's motion for partial summary judgment of non-infringement "that

different sections of code would be *equivalent* to a single section for both normal exits as well as for exception exits[,] CA has therefore waived any doctrine of equivalents arguments concerning the .NET agent." New Relic Objs. at 13. Indeed, several district courts have cited *Boss Control* for this very principle. *Nystrom v. Trex Co.*, No. CIV.A. 2:01CV905, 2006 WL 208591, at *4 (E.D. Va. Jan. 25, 2006), *aff'd*, 200 F. App'x 987 (Fed. Cir. 2006) (finding that "the present matter mirrors *Boss* [*Control*]" and holding that the plaintiff had waived the doctrine of equivalents claim because, "[a]lthough plaintiff stated in his complaint that TREX infringed on the '831 patent 'either literally or equivalently,' plaintiff failed to argue during the *Markman* hearing or at any other time in opposition of summary judgment that plaintiff could establish infringement 'equivalently.'"); *Hutchins v. Zoll Med. Corp.*, 430 F. Supp. 2d 24, 35 n.35 (D. Mass. 2006) *aff'd*, 492 F.3d 1377 (Fed. Cir. 2007) ("Because Plaintiff has not presented any argument concerning infringement under the doctrine of equivalents, that issue has been waived."); *see also Media Digital, Inc. v. Toshiba Am. Info. Sys., Inc.*, No. 12-CV-313, 2015 WL 1867864, at *14 (D.N.H. Apr. 23, 2015) (citing *Boss Control* and holding that the defendants' argument that the patent is indefinite, which was raised in an exhibit to the parties' joint claim construction and prehearing statement, had been waived because "[t]he defendants have not advanced any developed argument to that effect in their memoranda").

The Court points out, however, that *Boss Control* and the other appellate cases cited by New Relic espouse a legal principle not implicated by the circumstances presented here. Specifically, *Boss Control* concerns whether the appellant waived its doctrine of equivalents claim for the purposes of the Federal Circuit's consideration of that claim *on appeal*. *See Auburn Univ. v. Int'l Bus, Machines, Corp.*, 864 F. Supp. 2d 1222, 1228 (M.D. Ala. 2012) (interpreting *Boss Control* to mean that the plaintiff, by failing to oppose summary judgment

based on the doctrine of equivalents, "would be held to have waived an appeal based on a doctrine of equivalents theory" if the defendant's summary judgment motion was granted). Here, by contrast, the question is whether a doctrine of equivalents claim as to the .NET agent *can survive summary judgment and proceed to trial* where CA did not raise an equivalents argument as to the .NET agent or present evidence in support of that theory in opposition to New Relic's motion for partial summary judgment. Accordingly, *Boss Control* is not directly on point here.

The Court's analysis does not end there, however. Although New Relic cites the incorrect legal principle, the crux of its argument is that CA has *abandoned* any claim that the .NET agent infringes under the doctrine of equivalents by failing to pursue or support that claim in opposition to summary judgment. The Court will therefore address whether CA's doctrine of equivalents claim should be deemed abandoned.

"Federal courts have the discretion to deem a claim abandoned 'when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'" *Hardy v. City of New York*, 732 F. Supp. 2d 112, 125 (E.D.N.Y. 2010) (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)); *see, e.g.*, *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006) ("Because plaintiff's opposition papers did not address defendants' motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone."). While courts generally consider claims abandoned in such circumstances, they are not required to do so. *Szarzynski v. Roche Labs., Inc.*, No. 07-CV-6008, 2010 WL 811445, at *15 (W.D.N.Y. Mar. 1, 2010) (citing *Barlow v. Connecticut*, 319 F. Supp. 2d 250, 266–67 (D. Conn. 2004)); *see Lipton v. Cnty. of Orange*, 315 F.Supp.2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally

will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."). Therefore, the question whether a claim should be deemed abandoned lies within the sound discretion of the court. *See, e.g.*, *Rohn Padmore, Inc. v. LC Play Inc.*, 679 F. Supp. 2d 454, 459 (S.D.N.Y. 2010) ("Where one party fails to respond to an opposing party's argument that its claim must be dismissed, courts *may* exercise their discretion and deem the claim abandoned." (quotation marks omitted and emphasis supplied)); *Wick v. Wabash Holding Corp.*, 801 F. Supp. 2d 93, 105 (W.D.N.Y. 2011).

The circumstances presented here indicate that CA abandoned its doctrine of equivalents claims as to the .NET agent. CA generally asserts in the Complaint that New Relic has infringed the '935 Patent "literally and/or under the doctrine of equivalents." Complaint ("Compl.") ¶¶ 35, 41-42 [DE 1]. However, as discussed, CA did not argue in its memorandum of law opposing New Relic's motion for summary judgment that the .NET agent infringed under the doctrine of equivalents. *See, e.g.*, *Struthers v. City of N.Y.*, No. 12–CV–242, 2013 WL 2390721, at *18 (E.D.N.Y. May 31, 2013) (deeming the plaintiff's claim abandoned where the plaintiff failed to address the defendants' argument for summary judgment in his opposition brief.); *Robinson v. Roosevelt Union Free Sch. Dist.*, No. 10–CV–834, 2012 WL 1980410, at *6 (E.D.N.Y. May 31, 2012) (same); *accord IA Labs CA, LLC v. Nintendo Co.*, 863 F. Supp. 2d 430, 452 n.19 (D. Md. 2012) *aff'd*, 515 F. App'x 892 (Fed. Cir. 2013) (holding that where the plaintiff IA Labs "d[id] not even address the doctrine of equivalents in its opposition to Nintendo's motion [for summary judgment of non-infringement]" and "presented no evidence to support a claim of infringement under the doctrine of equivalents, [the plaintiff] has abandoned this argument") (citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys.*, 467 F.3d 1355, 1369 (Fed. Cir. 2006) (upholding district court's grant of summary judgment where plaintiff failed to timely provide evidence supporting

its theory of infringement)); *Funai Elec. Co. v. Daewoo Electronics Corp.*, No. C-04-01830, 2007 WL 7752069, at *37 (N.D. Cal. Nov. 26, 2007) ("Because Funai has not opposed Daewoo's request for summary judgment with respect to infringement of the ′332 patent under the doctrine of equivalents, the court concludes that Funai has abandoned that theory of liability and therefore GRANTS summary judgment in favor of Daewoo on that issue."); *see also Nike, Inc. v. Adidas Am. Inc.*, 479 F. Supp. 2d 664, 669-70 (E.D. Tex. 2007) (holding that patentee was not entitled to assert additional infringement allegations under doctrine of equivalents in response to court's construction of patent claim where, *inter ali*a, patentee "apparently chose to abandon any claim of infringement by equivalents" in its amended infringement contentions). CA also did not address the issue in Dr. Astrachan's declaration submitted in support of its opposition. The Court notes that, in his initial report, Dr. Astrachan asserts that the method by which the Java agent and the .NET agent copy code at each exit is equivalent to dependent claims 11, 20, 27, 33, and 46 of the '935 Patent requiring "try and finally functionality." *See* Report of CA Inc.'s Expert Owen Astrachan, Ph.D [DE 117-2] ¶¶ 105-108. However, CA does not cite or rely on this portion of Dr. Astrachan's initial report in order to oppose summary judgment as to the .NET agent under the doctrine of equivalents.

One factor potentially weighing against a finding of abandonment by CA is the cursory treatment with which New Relic has given its own doctrine of equivalents argument as to the .NET agent. As New Relic admits in a footnote in its Objections, although its motion for summary judgment "stated broadly that 'New Relic's Java and .NET agents do not infringe the asserted claims, as a matter of law, either literally or under the doctrine of equivalents,' . . . [t]he motion only substantively addressed equivalents with respect to the Java agent and the try / finally dependent claims." New Relic Objs. at 13 n.7 (quoting New Relic Mem. at 1; 20-21)

(emphasis omitted).  New Relic asserts that "[t]his is because . . . th[e] Java agent dependent claim equivalents argument was, and remains, the only doctrine of equivalents argument asserted by either of CA's experts in their respective reports and declarations concerning the '935 patent." New Relic Objs. at 14 n.7.  The fact that both parties gave short shrift to the question of whether the .NET agent infringes under the doctrine of equivalents perhaps accounts for the Special Master's recommendation that summary judgment be denied on this issue and his suggestion that expert discovery be re-opened.  *See* R&R at 23, 25-26.

However, the Court may still find that CA abandoned its claim that the .NET agent infringed under the doctrine of equivalents even though New Relic's motion did not present an argument on this issue.  New Relic's motion sought summary judgment of non-infringement as to both accused agents under both theories set forth in the Complaint:  literal infringement and infringement under the doctrine of equivalents.  *See* New Relic Mem. at 1; Compl. ¶¶ 35, 41-42. "When considering a motion for summary judgment, the Court must take into consideration the evidentiary standard of proof that pertains to the trial on the merits.  *Serby v. First Alert, Inc.*, No. 09-CV-4229, 2015 WL 968089, at *5 (E.D.N.Y. Mar. 4, 2015).  CA has the ultimate burden of proving infringement by a preponderance of the evidence.  *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1314 (Fed. Cir. 2011) (quoting *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1123 (Fed. Cir. 1985)).  As the Federal Circuit stated in *Creative Compounds*, "[i]f the patentee fails to meet that burden, the patentee loses regardless of whether the accused comes forward with any evidence to the contrary."  652 F.3d at 1314 (citing *Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008)); *see also Medtronic, Inc. v. Mirowski Family Ventures*, *LLC*, 571 —— U.S. ——,134 S. Ct. 843, 849 (2014) (holding where an accused infringer sought a declaratory judgment of non-infringement, "the burden of

proof is a substantive aspect of a claim . . . and cannot be considered a mere incident of a form of procedure." (internal quotation marks and citations omitted)).

Moreover, the Federal Circuit has established that, to support a finding of infringement under the doctrine of equivalents, a patentee must present, on "a limitation-by-limitation basis," "particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device or process . . . " *AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1328 (Fed. Cir. 2007) (quoting *Tex. Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996); *see Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1382 (Fed. Cir. 2009). "'The same rule applies in the summary judgment context.'" *AquaTex Indus.*, 479 F.3d at 1328 (quoting *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005)).

Applying these principles here, the Court concludes that, to preserve a theory of infringement under the doctrine of equivalents as to the .NET agent, CA had the burden to present evidence establishing a genuine issue of material fact as to why infringement under that doctrine could be found by the fact finder. *See generally Creative Compounds*, 652 F.3d at 1314. Specifically, "[CA] was required to provide particularized testimony and linking argument on a limitation-by-limitation basis that created a genuine issue of material fact as to equivalents." *AquaTex Indus.*, 479 F.3d at 1328-29. CA has not met that burden here. *See IA Labs*, 863 F. Supp. 2d at 452 n.19 (deeming the plaintiff's doctrine of equivalents argument abandoned where the plaintiff did not address that argument in opposition to summary judgment and "has presented no 'particularized testimony and linking argument on a limitation-by-limitation basis' to support this theory." (quoting *AquaTex Indus.*, 479 F.3d at 1328–29)).

Finally, the Court notes that expert discovery closed in this case on March 28, 2014. *See* DE 90; Elec. Order of Mar. 3, 2014. Prior to that time, CA had ample opportunity to develop expert evidence to support its doctrine of equivalents argument against the .NET agent, which CA could them have presented in opposition to New Relic's motion for summary judgment. The fact that CA apparently did not do so, in the Court's view, does not justify re-opening expert discovery to allow CA to revisit the equivalence issue at this late juncture in the case. Moreover, although the expert reports focus on the parties' differing interpretations of "exit code," as the Special Master points out, *see* R&R at 25-26, that fact did not foreclose CA from addressing its doctrine of equivalents claim against the .NET agent in opposition to New Relic's motion for summary judgment.

In light of the foregoing factors, the Court determines in its discretion that CA has abandoned its claim that the .NET agent infringes under the doctrine of equivalents. Accordingly, New Relic's objections to the Special Master's recommendation that summary judgment of non-infringement be denied, in part, as to the .NET agent under the doctrine of equivalents are SUSTAINED. The Court hereby MODIFIES the Special Master's R&R and GRANTS summary judgment of non-infringement in favor of New Relic as to the .NET agent under the doctrine of equivalents. Accordingly, New Relic's motion for partial summary judgment of non-infringement is GRANTED.

### E.     The Special Master's Recommendation That Summary Judgment of Invalidity of the '935 Patent Be Denied

New Relic also objects to the R&R's recommendation that New Relic's motion for summary judgment based on the invalidity of the '935 Patent be denied. *See* New Relic Objs. at 16-17. As discussed, the Special Master concluded that there is a genuine dispute as to the following issues of fact which are "crucial to New Relic's defense of anticipation:"

- Whether the Dahm article discloses adding exit code to existing object code.

- Whether the Dahm article discloses adding code to byte code for use as part of a profiling process.

- Whether the Dahm article discloses creating a grouping of all or a portion of the existing object code and associating that grouping with exit code to be performed if an exception occurs during execution of the grouping.

- Whether the Dahm article discloses adding start and exit codes that are calls to methods that start and stop profiling processes.

- Whether the Dahm article discloses adding try and finally functionality to existing object code.

- Whether the Dahm article discloses adding new finalization code that is called if a handled exception occurs.

- Whether the JavaClass documentation and code disclose adding exit code to the existing object code.

R&R at 25. New Relic disagrees, arguing that "the Dahm article and JavaClass system, both admittedly prior art, anticipate each asserted claim of the '935 patent because each prior art reference discloses all of their recited elements." New Relic Objs. at 16. In New Relic's view, "the Dahm article and JavaClass disclose the very elements the Special Master concludes are disputed fact issues, and thus, there are no "unresolved issues of material fact relating to New Relic's defense of anticipation." *Id.* at 17. New Relic therefore objects to the Special Master's recommendation that the Court deny New Relic's motion for summary judgment that the asserted claims of the '935 patent are invalid as anticipated by the Dahm article and the JavaClass system. *Id.* CA, for its part, urges the Court to adopt the Special Master's recommendation to deny summary judgment based on invalidity in light of the "seven discrete issues of material fact" identified in the R&R. CA Objs. at 19.

Having conducted a *de novo* review, the Court agrees with the Special Master that New

Relic has not demonstrated its entitlement to summary judgment with respect to invalidity. In

particular, New Relic has not met its burden of establishing by clear and convincing evidence

that each asserted claim of the '935 Patent is invalid as anticipated by the Dahm article and the

JavaClass system. *See TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1340 (Fed. Cir. 2010)

(internal quotation and citation omitted) ("Because patents are presumed valid, a moving party

seeking to invalidate a patent at summary judgment must submit such clear and convincing

evidence of facts underlying invalidity that no reasonable jury could find otherwise."); *Crown

Operations*, 289 F.3d at 1375 ("A patent is invalid for anticipation when the same device or

method, having all of the elements contained in the claim limitations, is described in a single

prior art reference."); *see also Microsoft Corp.*, 131 S.Ct. at 2244–46. Although there is no

dispute that the Dahm article qualifies as prior art and, as the Special Master points out, the

parties have stipulated as to certain disclosures made by the Dahm article, *see* R&R at 24,

genuine issues of material fact remain regarding the scope of that prior art and its relationship to

the '935 Patent because the parties "offer reasonable alternative and conflicting arguments as to

the correct interpretation of the prior art." *Serby*, 2015 WL 968089, at *6 (citing *Alloc, Inc. v.

Norman D. Lifton Co.*, 653 F. Supp. 2d 469, 478 (S.D.N.Y. 2009) ("A court should not grant

summary judgment on invalidity where the parties present reasonable alternative arguments as to

the correct interpretation of the prior art.") (citing *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679–

80 (Fed. Cir. 1984)); *see also Nassau Precision*, 2015 WL 1514257, at *6 (noting that

"[a]nticipation is a question of fact" which is "often inappropriate for summary judgment.").

Those disputes are aptly summarized in the seven "salient fact issues" listed in the R&R. R&R

at 25. Moreover, as noted by the Special Master, there is a genuine dispute whether the Dahm

article and JavaClass system are merely duplicative of the prior art which was before the Examiner during the patent prosecution. *Id.* at 25-26. Accordingly, the Court concludes that summary judgment based on invalidity is inappropriate at this stage.

For the foregoing reasons, New Relics's objections to Special Master's recommendation that summary judgment be DENIED as to invalidity are OVERRULED, and the Court hereby ADOPTS the Special Master's recommendations. Accordingly, New Relic's motion for partial summary judgment based on invalidity is DENIED.

### F. The Special Master's Recommendation That Expert Discovery Be Re-Opened

Finally, New Relic vigorously objects to the Special Master's recommendation that the Court permit expert discovery to be re-opened so that the parties' experts may address infringement in light of the Special Master's discussion of "exit code." *See* New Relic Objs. at 17-23; R&R at 25-26.[6] However, the Court need not address these objections because, as discussed above, the Court has modified the R&R to grant New Relic's motion for summary judgment of non-infringement in its entirety, and additional discovery is therefore unnecessary. Accordingly, the Court REJECTS AS MOOT the Special Master's recommendation that the Court re-open expert discovery.

## V. CONCLUSION

For the reasons set forth in this Memorandum Decision and Order, the Court

(1) OVERRULES the objections by CA; and (2) OVERRULES, in part, and SUSTAINS, in part, the objections by New Relic. The Court further (1) ADOPTS the R&R, in part, to the extent that it recommends (a) granting summary judgment of non-infringement as to the Java Agent,

---

[6]     CA does not address the propriety of this recommendation in its Objections. *See generally* CA Objs.

(b) granting summary judgment of non-infringement as to the .NET agent based on literal infringement, and (c) denying summary judgment on the claim of invalidity of the '935 Patent; and (2) MODIFIES the R&R, in part, to the extent of granting summary judgment of non-infringement as to the .NET agent under the doctrine of equivalents. Finally, the Court REJECTS AS MOOT the Special Master's recommendation that expert discovery be re-opened in light of the Court's decision to modify the R&R to grant summary judgment of non-infringement as to the .NET agent in its entirety. Accordingly, New Relic's motion for partial summary judgment is GRANTED, in part, as to non-infringement, and DENIED, in part, as to the validity of the '935 Patent.

**SO ORDERED.**

Dated: Central Islip, New York
September 28, 2015

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge